EASTERN ASSOCIATED COAL
CORP., Plaintiff,

v.

UNITED MINE WORKERS OF
AMERICA, District 17, and Lo-
cal Union No. 1503, Defendants.

Civil Action No. 297–0819.

United States District Court,
S.D. West Virginia,
Charleston Division.

Sept. 30, 1998.

Forrest H. Roles, Heenan, Althen & Roles, Charleston, WV, Donna C. Kelly, Heenan, Althen & Roles, Charleston, WV, for plaintiff.

Kevin F. Fagan, District 17, UMWA, Charleston, WV, Charles F. Donnelly, Donnelly Carbone & Kettler, Charleston, WV, for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on cross motions for summary judgment filed by the parties pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. Plaintiff seeks vacation of an arbitration award. Defendants oppose vacation of the award and seek to have the award confirmed and enforced by the court.

## I. *Background*

The following facts are not disputed by the parties. Plaintiff Eastern Associated Coal Corporation ("Eastern") and defendants United Mine Workers of America, District 17, and United Mine Workers of America Local Union 1503 (collectively, "UMWA"), are parties to a collective bargaining agreement known as the National Bituminous Coal Wage Agreement of 1993 (the "Wage Agreement"). Article IA, Section (d) of the Wage Agreement reserves to Eastern the exclusive right to hire and discharge employees. (Plaintiff's Motion for Summary Judgment, Attachment 1). The right of Eastern to discharge employees is limited, however, by Article XXIV, Section (a) of the Wage Agreement, which provides that "[n]o employee covered by this Agreement may be disciplined or discharged except for just cause." (*Id.*). Article XXIV, Section (d)(3) of the Wage Agreement applies to those situations where an employee grieves a discharge and the case proceeds to arbitration. Under such circumstances, Section (d)(3) mandates that:

> If the arbitrator determines that the Employer has failed to establish just cause for the Employee's discharge, the Employee shall be immediately reinstated to his job. If the arbitrator determines that there was just cause for the discharge, the discharge shall become effective upon the date of the arbitrator's decision.

(*Id.*).

Eastern employs a road crew charged with maintaining its mine haulage roads. Members of the road crew hold positions with the company known as Mobile Equipment Operators ("MEO"). Included within the duties performed by MEOs is the operation of equipment having gross vehicle weights ranging from 32,000 to 55,000 pounds on public roads and highways. Operators of such equipment are required to have a commercial driver's license ("CDL") and are subject to certain sections of the Federal Motor Carrier Safety Regulations promulgated by the United States Department of Transportation (the "DOT Regulations").[1] Eastern implemented a random drug testing policy for its MEO staff in accordance with the DOT Regulations.

In early 1996, James Smith, a drilling operator with Eastern, posted for a vacant MEO position and was eventually hired. In conjunction with his new position, Mr. Smith was required to have a CDL in order to carry out the duties of the job. Pursuant to the DOT Regulations, Mr. Smith was subjected to a random drug test on March 25, 1996. He tested positive for the presence of cannabinoids.[2] In accordance with Article XXIV of the Wage Agreement, Eastern initially suspended Mr. Smith with the intent to discharge and then discharged him. Mr. Smith filed a grievance challenging his discharge and the case proceeded to arbitration.

Arbitrator Jerome H. Ross heard the case and issued an award on April 18, 1996, returning Mr. Smith to work after a 30-day suspension without back pay and requiring Mr. Smith to participate in a substance abuse program. In addition, the arbitrator's award required Mr. Smith to submit to random drug testing at the discretion of either Eastern or some other approved substance abuse professional for a period of five years.

Mr. Smith was randomly tested again on April 24, 1996, October 11, 1996, and January 27, 1997; each time he tested negative for illegal drug use. On June 27, 1997, Mr. Smith was randomly tested at which time he tested positive for cannabi-

---

1. The Federal Motor Carrier Safety Regulations, 49 C.F.R. § 382.101 *et seq.*., require that any person required to have a CDL submit to controlled substances testing under specific circumstances, including when an employee transfers from a non-CDL position to a CDL position. 49 C.F.R. § 382.301. In addition, the regulations also provide for random drug testing of any person holding a CDL. *Id.* at § 382.305.

2. Neither the UMWA nor Mr. Smith challenged the results of the March 25, 1996 drug test.

noids.[3] Eastern again suspended Mr. Smith with intent to discharge and subsequently discharged him. Mr. Smith grieved his discharge and the case proceeded to arbitration in front of Arbitrator Jerome T. Barrett.

The issues before Arbitrator Barrett were framed as follows: (1) "Was the suspension with intent to discharge of grievant James Smith on July 14, 1997 for just cause?" and (2) "And if not, what is the appropriate remedy?" (Defendant's Motion for Summary Judgment, Attachment A at p. 2).

Arbitrator Barrett identified the pertinent portions of the Wage Agreement as follows: (1) Article 1A, Section (d) which reserves to Eastern the exclusive right to hire and discharge its working force; (2) Article III, Section (a) which grants all employees the right to a safe and healthful work environment; (3) Article III, Section (g) which requires Eastern employees to comply with reasonable rules and regulations of Eastern so long as such rules or regulations do not conflict with state and federal laws; and (4) Article XXIV, Sections (a) through (d) regarding Eastern's discharge, grievance and arbitration procedures. (*Id.* at pp. 2–3).

Eastern argued at the arbitration hearing that it had just cause to discharge Mr. Smith as a result of his testing positive for drug use on two separate occasions during a sixteen month period in which time he was employed as a heavy equipment operator. (*Id.* at pp. 3–4). Eastern argued that the DOT Regulations and its own internal drug policy were implemented to curb drug use by employees occupying safety sensitive positions. (*Id.* at p. 3). According to the company, Mr. Smith's

drug use jeopardized the safety of other Eastern employees as well as the public at large and made his discharge just under the circumstances. (*Id.* at p. 4). The company further argued that it was proper to discharge Mr. Smith in order to send a clear message to all Eastern employees of the company's serious stance against employee drug use. (*Id.*).

The UMWA countered by citing to Mr. Smith's employment record, noting that the two failed drug tests were the only bad marks on an otherwise exemplary 17–year employment history with Eastern. (*Id.*). The UMWA argued that discharge was too severe a penalty given Mr. Smith's long-term service with Eastern. (*Id.*). Moreover, the union argued that neither Eastern's drug policy nor the DOT Regulations required mandatory discharge of an employee under these circumstances.[4] (*Id.*).

After summarizing the testimony adduced at a hearing held on July 28, 1997, and the positions of the parties, Arbitrator Barrett found that:

> It is understandable why the company wants to put an end to the matter by discharging grievant. The liability the company faces when an employee assigned to operate company equipment on public roads is found with drugs in his urine is very real. As is the cost of a second arbitration for the same employee on the same issue within a sixteen month period.
>
> Having been an otherwise solid employee for a significant period of time is certainly in grievant's favor. However, grievant got full credit for his good record in the earlier arbitration. Also to his credit in the earlier case, he was

---

3. Neither the UMWA nor Mr. Smith challenged the results of the June 27, 1997 drug test.

4. Eastern's Drug and Alcohol Policy and Testing Procedures were entered into evidence by the company at the arbitration hearing. Although the entirety of the drug policy was not entered as part of the record before the court, Eastern cited to paragraph E in its response

to the UMWA's motion for summary judgment, filed December 12, 1997. Paragraph E of Eastern's drug policy provides that "[i]f a driver submits a urine specimen for the purpose of a drug test, and the test shows positive levels ... the driver will be removed from any safety sensitive position and subject to disciplinary action up to and including termination." (Plaintiff's Response to Defendant's Motion for Summary Judgment, at p. 7 n. 3).

found to be a recreational user of illegal drugs and not an addicted user. Being rescued by an arbitrator from losing his job in 1996 and having to face an invasive program of rehabilitation would seem to have provided unambiguous notice of the need to correct his behavior. It should have been interpreted as a clear message that drug use and secure employment do not mix.

\* \* \* \* \* \*

Grievant made a very personal appeal under oath to the arbitrator concerning a personal/family problem which caused this one time lapse in drug usage. The arbitrator found this testimony creditable [sic]. If the arbitrator was misled by the grievant, the arbitrator is confident that the grievant will make another misstep with drug use and be caught. The remedy provided here will assure that the company and union will not be required to use arbitration again for this grievant where drugs are involved.

(*Id.* at pp. 4–5).

Arbitrator Barrett issued an award suspending Mr. Smith until October 20, 1997, and then reinstating him, subject to the following conditions:

1. No back pay for any loss during this suspension.

2. The award by Arbitrator Ross in CAS No. 93–17–96–472 is reinstated.

3. Grievant will reimburse the company and the union for the arbitrators' bills in both the Ross case and the instant case.

4. Grievant will provide the union and company with a signed, undated letter of resignation which the company may date and accept if grievant tests positive for any illegal drug in the next five years.

5. During the grievant's suspension period, grievant's name shall remain in the company's random drug testing program. if grievant fails to take a required test during his suspension, the company can date and accept his resignation letter.

6. The company and union ·may agree that unusual or unforeseen circumstances justify waiving any conditions set forth above.

(*Id.* at p. 6).

In its motion for summary judgment, Eastern seeks vacation of the award on the grounds that the award is contrary to public policy and that it fails to draw its essence from the Wage Agreement. In addition, Eastern contends that Arbitrator Barrett exceeded the authority granted to him pursuant to the Wage Agreement by failing to address the issue of whether Eastern had just cause to discharge Mr. Smith. The UMWA contends in its summary judgment motion that the award did not contravene any well defined and dominant public policy and was based upon the arbitrator's interpretation of the contract so as to draw its essence from the Wage Agreement. Accordingly, the UMWA seeks enforcement of the award.

## II. *Discussion*

 It is well settled that courts overwhelmingly defer to the arbitrator's resolution of a labor dispute. Under the United States Supreme Court's *Steelworkers* Trilogy, it is clear that judicial review of labor arbitration awards under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, is extremely limited. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960). In restricting judicial review, the Court has emphasized:

[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business

overruling him because their interpretation of the contract is different from his. *Enterprise Wheel*, 363 U.S. at 599, 80 S.Ct. 1358. Consequently, courts are not authorized to reconsider the merits of an arbitration award despite allegations by the parties that the award is based upon erroneous facts or a misinterpretation of the underlying contract. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* at 38, 108 S.Ct. 364.

Nevertheless, the arbitrator may not "ignore the plain language of the contract." *Id.* Rather, the arbitrator's award "must draw its essence from the contract and cannot simply reflect the arbitrator's own motions of industrial justice." *Id.* An award fails to draw its essence from the contract "if the arbitrator must have based his award on his own personal notions of right and wrong", *Upshur Coals Corp. v. UMWA, Dist. 31,* 933 F.2d 225, 229–30 (4th Cir.1991) (citing *E.I. DuPont de Nemours and Co. v. Grasselli Employees Indep. Ass'n,* 790 F.2d 611, 614 (7th Cir. 1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986)), or is not "rationally inferable" or "in some logical way" derived from the collective bargaining agreement, *Brotherhood of R.R. Trainmen v. Central of Ga. Ry.,* 415 F.2d 403, 412 (5th Cir.1969), *cert. denied,* 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). An award does not draw its essence from the collective bargaining agreement if the award conflicts with the express terms of the contract, *Vic Wertz Distributing Co. v. Teamsters Local 1038, Nat'l Conference of Brewery Workers,* 898 F.2d 1136, 1141–43 (6th Cir.1990), or the meaning given to clear and unequivocal contract language by the arbitrator is "other than that expressed by the agreement." *Georgia–Pacific Corp. v. Local 27, United Paperworkers Int'l Union,* 864 F.2d 940, 944 (1st Cir.1988).

In determining whether an award draws its essence from the collective bargaining agreement, it is also appropriate to consider whether the arbitrator exceeded his contractual authority. *Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n,* 889 F.2d 599, 602 (5th Cir.1989), *cert. denied,* 498 U.S. 853, 111 S.Ct. 148, 112 L.Ed.2d 114 (1990). When a collective bargaining agreement provides that disciplinary rights are reserved exclusively to management, and specifies conduct that warrants discharge, the arbitrator may not infringe on those rights by modifying the discipline imposed. *Warrior & Gulf Navigation Co. v. United Steelworkers of America,* 996 F.2d 279 (11th Cir.1993), *cert. denied,* 511 U.S. 1083, 114 S.Ct. 1834, 128 L.Ed.2d 462 (1994) (where agreement provides for immediate discharge of employee who tests positive for drugs a second time, arbitrator, on finding that second positive test was legitimate, may not reduce penalty to disciplinary suspension); *Delta Queen,* 889 F.2d 599 (where agreement reserves to management the sole responsibility to discipline and discharge for proper cause, such as carelessness, and the arbitrator finds "grossly careless" conduct by discharged employee, the arbitrator may not award reinstatement notwithstanding his belief that discharge was unfair in light of the employee's long-standing service); *Georgia–Pacific,* 864 F.2d 940, 944–46 (where agreement provides for immediate discharge for dishonesty and arbitrator makes factual finding of dishonesty, he may not award reinstatement on the reasoning that employee's years of faithful performance constitute a "countervailing factor" entitling him to at least one opportunity to correct his ways before being discharged).

In those instances where the collective bargaining agreement does not specify the conduct that constitutes cause for discharge, arbitrators may look to other sources for guidance. Among the sources deemed to be an integral part of

the agreement are management work rules and disciplinary enforcement policies and practices. *Norfolk Shipbuilding & Drydock Corp. v. Local No. 684, Int'l Bhd. of Boilermakers,* 671 F.2d 797, 799–800 (4th Cir.1982); *see also Brigham & Women's Hosp. v. Massachusetts Nurses Assoc.,* 684 F.Supp. 1120, 1123–24 (D.Mass. 1988) (where agreement gave employer right to discharge for "just cause," arbitrator properly looked to hospital's disciplinary policy to determine meaning of the term). Indeed, it is held that where the collective bargaining agreement reserves to management the right to make and enforce disciplinary rules, rules promulgated pursuant to that authority are thus incorporated into the collective bargaining agreement and have "the force of contract language." *General Drivers, Warehousemen & Helpers Local Union 968 v. Sysco Food Services, Inc.,* 838 F.2d 794, 796 n. 1, 799 n. 4 (5th Cir.1988). Where a collective bargaining agreement reserves to management the right to establish reasonable rules and regulations and the right to discharge for cause, but does not set out what constitutes just cause, it is proper for the arbitrator to look to company rules and regulations to determine whether or not a discharge was warranted. *Posadas de Puerto Rico Assoc., Inc. v. Union de Trabajadores de la Industria Gastronomica, Local 610,* 670 F.Supp. 58, 63 (D.P.R.1987).

■ Here, the collective bargaining agreement between Eastern and the UMWA reserves to Eastern the right to implement reasonable rules and regulations not inconsistent with federal and state laws. Eastern's drug policy was implemented by the company in accordance with its reserved right to implement rules and regulations. Consequently, it must be deemed an integral part of the collective bargaining. *See General Drivers, Warehousemen & Helpers Local Union 968,* 838 F.2d at 796 n. 1, 799 n. 4. For its part, Eastern has asserted as much in its brief

before the court.[5] Moreover, the UMWA has not challenged Eastern's right under the collective bargaining agreement to impose the drug policy, adopted by Eastern primarily for the purpose of complying with the DOT Regulations. In fact, the UMWA relied upon the drug policy during the arbitration proceeding as support for its position that discharge was inappropriate under the circumstances.

Under the Wage Agreement, Eastern has the exclusive right to direct its work force, including the right to hire and discharge its employees. Eastern's right to discharge employees is limited, however, to those situations where the company has just cause. The term "just cause" is not defined in the Wage Agreement itself. Thus, Arbitrator Barrett was obligated to look to other sources, including the company's substance abuse policy, for guidance in determining whether Mr. Smith's discharge was warranted. Eastern's substance abuse policy requires that an employee who tests positive for drugs be "removed from any safety sensitive position and subject to disciplinary action up to and including termination." *See supra* page 799, n. 4.

■ Having decided that the substance abuse policy is an integral part of the Wage Agreement, any decision made by the arbitrator pursuant to the disciplinary standard set forth within the company's substance abuse policy would be appropriate. Although Arbitrator Barrett did not specifically find the existence of just cause to discharge Mr. Smith, a reading of his entire opinion leads the court to conclude that he found just cause to discipline Mr. Smith, in accordance with the terms of the substance abuse policy. Specifically, Arbitrator Barrett suspended Mr. Smith for two and one-half months without pay, then reinstated him subject to several conditions, including continuation of random

---

**5.** In its memorandum in support of its motion for summary judgment, Eastern asserted that its substance abuse policy "must be deemed an integral part of the collective bargaining

agreement." (Plaintiff's Memorandum in Support of Motion for Summary Judgment, at p. 12).

drug testing for a period of five years as well as mandatory resignation in the event of any future positive drug test. Based upon this award, it appears as though Arbitrator Barrett interpreted the substance abuse policy to allow for suspension and discipline. Inasmuch as the substance abuse policy calls for the removal of employees in safety sensitive positions, but does not call for mandatory discharge, the court finds that the arbitrator's award, suspending Mr. Smith for two and one-half months without pay, and reinstating him subject to strict conditions, is "rationally inferable" from the Wage Agreement. Having found that the award is rationally inferable from the Wage Agreement, the court does not find that Arbitrator Barrett exceeded his authority under the agreement.

Eastern argues that *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,* No. 2:93–0862 (S.D.W.Va. February 27, 1995), *aff'd,* 76 F.3d 606 (4th Cir. 1996), *cert. denied,* 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996), is controlling in this action, and requires the court to vacate the arbitrator's award on the ground that it represents the arbitrator's own brand of industrial justice and does not draw its essence from the Wage Agreement. However, the facts of this case are to be distinguished from those before the court in *Mountaineer.* In *Mountaineer,* the company's substance abuse policy contained a provision requiring immediate termination of any employee testing positive for drug use. Here, Eastern's substance abuse policy does not require mandatory termination. Rather, the policy requires discipline "up to and including termination." The disciplinary standard embodied within Eastern's substance abuse policy differentiates this case from *Mountaineer.* Accordingly, the court finds that Arbitrator Barrett's award draws its essence from the Wage Agreement and does not represent his own "brand of industrial justice."

Eastern also argues that Arbitrator Barrett's award should be set aside on public policy grounds. The question of public policy is "ultimately one for resolution by the courts." *Misco,* 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286. However, courts should be reluctant to vacate arbitration awards on public policy grounds. *Id.* Therefore, an arbitrator's award should be set aside only in those situations "where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant'". *Id.* (quoting *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 767, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)). A well defined and dominant public policy is one that may "be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* Consequently, a "formulation of public policy based only on 'general considerations of supposed public interests' is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement." *Id.* at 44, 108 S.Ct. 364. Thus, to vacate an arbitration award on public policy grounds, the court must find that "an explicit, well defined and dominant public policy exists and the policy is one that specifically militates against the relief ordered by the arbitrator." *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms,* 74 F.3d 169, 174 (9th Cir.1995) (quoting *Arizona Elec. Power Cooperative, Inc. v. Berkeley,* 59 F.3d 988, 992 (9th Cir.1995)).

In this action, Eastern argues that the DOT Regulations articulate a well defined and dominant public policy against the operation of dangerous machinery by employees who test positive for drug use. The DOT Regulations were promulgated to encourage employers "to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles." 49 C.F.R. § 382.101 (1998). According to Eastern, the DOT Regulations were enacted primarily to protect the public from

injury and necessarily cover those situations where an employee tests positive for drug use despite a lack of evidence that he was under the influence of drugs while operating heavy equipment.

The court must first determine whether or not there is a well defined and dominant public policy militating against the arbitrator's decision in this case. There is a plentitude of positive law to support the existence of a well defined and dominant public policy against the performance of safety sensitive jobs by employees under the influence of drugs. *See, e.g., Gulf Coast Indus. Workers Union v. Exxon Co.*, 991 F.2d 244, 252–53 (5th Cir.1993) (recognizing that numerous statutes, regulations, and judicial opinions "pronounce the emphatic national desire to eradicate illicit drugs from the workplace," particularly in safety sensitive occupations); *Exxon Corp. v. Baton Rouge Oil & Chem. Workers Union*, 77 F.3d 850, 855–56 (5th Cir.1996) (finding within the Federal Railroad Administration regulations a well defined and dominant public policy against the performance of safety sensitive jobs while under the influence of drugs); *Union Pacific R.R. Co. v. United Transp. Union*, 3 F.3d 255, 262 (8th Cir.1993) (court concluded that Federal Railroad Administration regulations incorporate a well defined and dominant public policy against permitting railroad employees to perform their jobs while under the influence of intoxicants); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 861 F.2d 665, 674 (11th Cir.1988) (court recognized clear established public policy contained within Federal Aviation Administration regulations condemning operation of passenger airliners by pilots under the influence of drugs or alcohol).

Additionally, there is legal precedent which expands this public policy from situations where the employee is shown to be under the influence of drugs to situations where the employee merely tests positive for drugs although there is no evidence that he was under the influence while on the job. *See Exxon Corp. v. Esso Workers' Union, Inc.*, 118 F.3d 841 (1st Cir. 1997) (holding that reinstatement of employee in safety sensitive job who failed drug test violated public policy embodied within the Drug–Free Workplace Act despite lack of evidence that employee was under influence of drugs at work); *Exxon Corp. v. Baton Rouge Oil & Chem. Workers Union*, 77 F.3d 850, 856 (5th Cir.1996) (holding that allowing employee to collect back pay would contravene public policy contained within Federal Railroad Administration regulations despite the absence of any evidence that employee had actually performed his job while drug-impaired).

█ Based upon the foregoing, the court finds that a well defined and dominant public policy exists against the use of controlled substances by those who perform safety sensitive jobs. Thus, Eastern has satisfactorily negotiated the first step of the public policy analysis. To abandon Arbitrator Barrett's award as contrary to public policy, however, the court must also find that his award of reinstatement contravenes the identified policy. *Exxon Corp. v. Esso Workers' Union, Inc.*, 118 F.3d at 849. Eastern argues that the public policy embodied in the DOT Regulations is sufficiently well defined and dominant to support vacation of Arbitrator Barrett's award. There is no question that the DOT Regulations relied upon by Eastern articulate a well defined and dominant public policy against drug use by persons employed as commercial motor vehicle drivers.[6] Nevertheless, the DOT Regulations do not express an explicit, well defined public policy permanently en-

---

**6.** The purpose of the DOT Regulations is to encourage employers "to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles." 49 C.F.R. § 382.101. The DOT Regulations also indicate that the purpose behind the CDL requirement is "to help reduce or prevent truck and bus accidents, fatalities, and injuries by requiring drivers to have a single commercial motor vehicle driver's license and by disqualifying drivers who operate commercial motor vehicles in an unsafe manner." *Id.* at § 383.1.

joining the employment of commercial motor vehicle drivers who test positive for drug use. Specifically, the DOT Regulations do not require that employees who test positive for drug use be automatically discharged. Here, the arbitrator ordered reinstatement of Mr. Smith, subject, however, to several conditions, including continued random drug testing and mandatory resignation in the event of a future positive drug test. Because the DOT Regulations do not make it illegal to reinstate employees who test positive for drug use, it cannot be said that the DOT Regulations "specifically militate against the relief ordered by the arbitrator" in this case. *United Food & Commercial Workers Int'l Union, Local 588,* 74 F.3d at 174. Consequently, the public policy exception does not apply inasmuch as the arbitrator's award is consistent with the DOT Regulations.

### III. *Conclusion*

For the reasons stated, it is ORDERED that defendants' motion for summary judgment be, and it hereby is, granted. Accordingly, it is further ORDERED that plaintiff's motion for summary judgment be, and it hereby is, denied.