EASTERN ASSOCIATED COAL CORP. *v.* UNITED
MINE WORKERS OF AMERICA,
DISTRICT 17, ET AL.

No. 99–1038.   Argued October 2, 2000—Decided November 28, 2000

58

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 67.

*John G. Roberts, Jr.,* argued the cause for petitioner. With him on the briefs were *David G. Leitch, H. Christopher Bartolomucci, Ronald E. Meisburg, Anna M. Dailey,* and *Donna C. Kelly.*

*John R. Mooney* argued the cause for respondents. With him on the brief were *Jonathan P. Hiatt, James B. Coppess, Judith Rivlin, Charles F. Donnelly,* and *Laurence Gold.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Deputy Solicitor General Wallace, William Kanter, Mark W. Pennak, Nancy E. McFadden, Paul M. Geier,* and *Peter J. Plocki.**

JUSTICE BREYER delivered the opinion of the Court.

A labor arbitrator ordered an employer to reinstate an employee truck driver who had twice tested positive for marijuana. The question before us is whether considerations of public policy require courts to refuse to enforce that arbitration award. We conclude that they do not. The courts may enforce the award. And the employer must reinstate, rather than discharge, the employee.

---

*Briefs of *amici curiae* urging reversal were filed for the Air Transport Association of America et al. by *John J. Gallagher* and *Neal D. Mollen;* for the Equal Employment Advisory Council by *Robert E. Williams* and *Ann Elizabeth Reesman;* for Exxon Mobile Corp. by *Walter E. Dellinger* and *John F. Daum;* and for the Institute for a Drug-Free Workplace by *Peter A. Susser.*

*Theodore J. St. Antoine, John Kagel,* and *David E. Feller* filed a brief for the National Academy of Arbitrators as *amicus curiae* urging affirmance.

I

Petitioner, Eastern Associated Coal Corp., and respondent, United Mine Workers of America, are parties to a collective-bargaining agreement with arbitration provisions. The agreement specifies that, in arbitration, in order to discharge an employee, Eastern must prove it has "just cause." Otherwise the arbitrator will order the employee reinstated. The arbitrator's decision is final.   App. 28–31.

James Smith worked for Eastern as a member of a road crew, a job that required him to drive heavy trucklike vehicles on public highways.   As a truck driver, Smith was subject to Department of Transportation (DOT) regulations requiring random drug testing of workers engaged in "safety-sensitive" tasks.   49 CFR §§ 382.301, 382.305 (1999).

In March 1996, Smith tested positive for marijuana. Eastern sought to discharge Smith.   The union went to arbitration, and the arbitrator concluded that Smith's positive drug test did not amount to "just cause" for discharge.   Instead the arbitrator ordered Smith's reinstatement, provided that Smith (1) accept a suspension of 30 days without pay, (2) participate in a substance-abuse program, and (3) undergo drug tests at the discretion of Eastern (or an approved substance-abuse professional) for the next five years.

Between April 1996 and January 1997, Smith passed four random drug tests.   But in July 1997 he again tested positive for marijuana.   Eastern again sought to discharge Smith.   The union again went to arbitration, and the arbitrator again concluded that Smith's use of marijuana did not amount to "just cause" for discharge, in light of two mitigating circumstances.   First, Smith had been a good employee for 17 years.   App. to Pet. for Cert. 26a–27a.   And, second, Smith had made a credible and "very personal appeal under oath . . . concerning a personal/family problem which caused this one time lapse in drug usage."   *Id.*, at 28a.

The arbitrator ordered Smith's reinstatement provided that Smith (1) accept a new suspension without pay, this time

for slightly more than three months; (2) reimburse Eastern and the union for the costs of both arbitration proceedings; (3) continue to participate in a substance-abuse program; (4) continue to undergo random drug testing; and (5) provide Eastern with a signed, undated letter of resignation, to take effect if Smith again tested positive within the next five years. *Id.*, at 29a.

Eastern brought suit in federal court seeking to have the arbitrator's award vacated, arguing that the award contravened a public policy against the operation of dangerous machinery by workers who test positive for drugs. 66 F. Supp. 2d 796 (SDWV 1998). The District Court, while recognizing a strong regulation-based public policy against drug use by workers who perform safety-sensitive functions, held that Smith's conditional reinstatement did not violate that policy. *Id.*, at 804–805. And it ordered the award's enforcement. *Id.*, at 805.

The Court of Appeals for the Fourth Circuit affirmed on the reasoning of the District Court. 188 F. 3d 501, 1999 WL 635632 (1999) (unpublished). We granted certiorari in light of disagreement among the Circuits. Compare *id.*, at **1 (holding that public policy does not prohibit "reinstatement of employees who have used illegal drugs in the past"), with, *e. g.*, *Exxon Corp.* v. *Esso Workers' Union, Inc.*, 118 F. 3d 841, 852 (CA1 1997) (holding that public policy prohibits enforcement of a similar arbitration award). We now affirm the Fourth Circuit's determination.

## II

Eastern claims that considerations of public policy make the arbitration award unenforceable. In considering this claim, we must assume that the collective-bargaining agreement itself calls for Smith's reinstatement. That is because both employer and union have granted to the arbitrator the authority to interpret the meaning of their contract's language, including such words as "just cause." See *Steelwork-*

ers v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 599 (1960). They have "bargained for" the "arbitrator's construction" of their agreement. *Ibid.* And courts will set aside the arbitrator's interpretation of what their agreement means only in rare instances. *Id.*, at 596. Of course, an arbitrator's award "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *Paperworkers* v. *Misco, Inc.*, 484 U. S. 29, 38 (1987). "But as long as [an honest] arbitrator is even arguably construing or·applying the contract and acting within the scope of his authority," the fact that "a court is convinced he committed serious error does not suffice to overturn his decision." *Ibid.*; see also *Enterprise Wheel, supra,* at 596 (the "proper" judicial approach to a labor arbitration award is to "refus[e] . . . to review the merits"). Eastern does not claim here that the arbitrator acted outside the scope of his contractually delegated authority. Hence we must treat the arbitrator's award as if it represented an agreement between Eastern and the union as to the proper meaning of the contract's words "just cause." See St. Antoine, Judicial Review of Labor Arbitration Awards: A Second Look at *Enterprise Wheel* and Its Progeny, 75 Mich. L. Rev. 1137, 1155 (1977). For present purposes, the award is not distinguishable from the contractual agreement.

We must then decide whether a contractual reinstatement requirement would fall within the legal exception that makes unenforceable "a collective-bargaining agreement that is contrary to public policy." *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757, 766 (1983). The Court has made clear that any such public policy must be "explicit," "well defined," and "dominant." *Ibid.* It must be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid.* (quoting *Muschany* v. *United States*, 324 U. S. 49, 66 (1945)); accord, *Misco, supra,* at 43. And, of course, the question to be answered is not whether Smith's drug use itself violates public

policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate Smith with specified conditions, see App. to Pet. for Cert. 29a, run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?   See *Misco, supra,* at 43.

## III

Eastern initially argues that the District Court erred by asking, not whether the award is "contrary to" public policy "as ascertained by reference" to positive law, but whether the award "violates" positive law, a standard Eastern says is too narrow.   We believe, however, that the District Court correctly articulated the standard set out in *W. R. Grace* and *Misco,* see 66 F. Supp. 2d, at 803 (quoting *Misco, supra,* at 43), and applied that standard to reach the right result.

We agree, in principle, that courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law. Nevertheless, the public policy exception is narrow and must satisfy the principles set forth in *W. R. Grace* and *Misco.* Moreover, in a case like the one before us, where two political branches have created a detailed regulatory regime in a specific field, courts should approach with particular caution pleas to divine further public policy in that area.

Eastern asserts that a public policy against reinstatement of workers who use drugs can be discerned from an examination of that regulatory regime, which consists of the Omnibus Transportation Employee Testing Act of 1991 and DOT's implementing regulations.   The Testing Act embodies a congressional finding that "the greatest efforts must be expended to eliminate the . . . use of illegal drugs, whether on or off duty, by those individuals who are involved in [certain safety-sensitive positions, including] the operation of . . . trucks."   Pub. L. 102–143, §2(3), 105 Stat. 953.   The Act

adds that "increased testing" is the "most effective deterrent" to "use of illegal drugs." § 2(5). It requires the Secretary of Transportation to promulgate regulations requiring "testing of operators of commercial motor vehicles for the use of a controlled substance." 49 U. S. C. § 31306(b)(1)(A) (1994 ed., Supp. III). It mandates suspension of those operators who have driven a commercial motor vehicle while under the influence of drugs. 49 U. S. C. § 31310(b)(1)(A) (requiring suspension of at least one year for a first offense); § 31310(c)(2) (requiring suspension of at least 10 years for a second offense). And DOT's implementing regulations set forth sanctions applicable to those who test positive for illegal drugs. 49 CFR § 382.605 (1999).

In Eastern's view, these provisions embody a strong public policy against drug use by transportation workers in safety-sensitive positions and in favor of random drug testing in order to detect that use. Eastern argues that reinstatement of a driver who has twice failed random drug tests would undermine that policy—to the point where a judge must set aside an employer-union agreement requiring reinstatement.

Eastern's argument, however, loses much of its force when one considers further provisions of the Act that make clear that the Act's remedial aims are complex. The Act says that "rehabilitation is a critical component of any testing program," § 2(7), 105 Stat. 953, that rehabilitation "should be made available to individuals, as appropriate," *ibid.*, and that DOT must promulgate regulations for "rehabilitation programs," 49 U. S. C. § 31306(e). The DOT regulations specifically state that a driver who has tested positive for drugs cannot return to a safety-sensitive position until (1) the driver has been evaluated by a "substance abuse professional" to determine if treatment is needed, 49 CFR § 382.605(b) (1999); (2) the substance-abuse professional has certified that the driver has followed any rehabilitation program prescribed, § 382.605(c)(2)(i); and (3) the driver has passed a return-to-duty drug test, § 382.605(c)(1). In addi-

tion, (4) the driver must be subject to at least six random drug tests during the first year after returning to the job. § 382.605(c)(2)(ii). Neither the Act nor the regulations forbid an employer to reinstate in a safety-sensitive position an employee who fails a random drug test once or twice. The congressional and regulatory directives require only that the above-stated prerequisites to reinstatement be met.

Moreover, when promulgating these regulations, DOT decided not to require employers either to provide rehabilitation or to "hold a job open for a driver" who has tested positive, on the basis that such decisions "should be left to management/driver negotiation." 59 Fed. Reg. 7502 (1994). That determination reflects basic background labor law principles, which caution against interference with labor-management agreements about appropriate employee discipline. See, e. g., *California Brewers Assn.* v. *Bryant*, 444 U. S. 598, 608 (1980) (noting that it is "this Nation's long-standing labor policy" to give "employers and employees the freedom through collective bargaining to establish conditions of employment").

We believe that these expressions of positive law embody several relevant policies. As Eastern points out, these policies include Testing Act policies against drug use by employees in safety-sensitive transportation positions and in favor of drug testing. They also include a Testing Act policy favoring rehabilitation of employees who use drugs. And the relevant statutory and regulatory provisions must be read in light of background labor law policy that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management negotiation.

The award before us is not contrary to these several policies, taken together. The award does not condone Smith's conduct or ignore the risk to public safety that drug use by truck drivers may pose. Rather, the award punishes Smith by suspending him for three months, thereby depriving him of nearly $9,000 in lost wages, Record Doc. 29, App. A, p. 2;

it requires him to pay the arbitration costs of both sides; it insists upon further substance-abuse treatment and testing; and it makes clear (by requiring Smith to provide a signed letter of resignation) that one more failed test means discharge.

The award violates no specific provision of any law or regulation. It is consistent with DOT rules requiring completion of substance-abuse treatment before returning to work, see 49 CFR § 382.605(c)(2)(i) (1999), for it does not preclude Eastern from assigning Smith to a non-safety-sensitive position until Smith completes the prescribed treatment program. It is consistent with the Testing Act's 1-year and 10-year driving license suspension requirements, for those requirements apply only to drivers who, unlike Smith, actually operated vehicles under the influence of drugs. See 49 U. S. C. §§ 31310(b), (c). The award is also consistent with the Act's rehabilitative concerns, for it requires substance-abuse treatment and testing before Smith can return to work.

The fact that Smith is a recidivist—that he has failed drug tests twice—is not sufficient to tip the balance in Eastern's favor. The award punishes Smith more severely for his second lapse. And that more severe punishment, which included a 90-day suspension, would have satisfied even a "recidivist" rule that DOT once proposed but did not adopt—a rule that would have punished two failed drug tests, not with discharge, but with a driving suspension of 60 days. 57 Fed. Reg. 59585 (1992). Eastern argues that DOT's withdrawal of its proposed rule leaves open the possibility that discharge is the appropriate penalty for repeat offenders. That argument fails, however, because DOT based its withdrawal, not upon a determination that a more severe penalty was needed, but upon a determination to leave in place, as the "only driving prohibition period for a controlled substances violation," the "completion of rehabilitation requirements

and a return-to-duty test with a negative result." 59 Fed. Reg. 7493 (1994).

Regarding drug use by persons in safety-sensitive positions, then, Congress has enacted a detailed statute. And Congress has delegated to the Secretary of Transportation authority to issue further detailed regulations on that subject. Upon careful consideration, including public notice and comment, the Secretary has done so. Neither Congress nor the Secretary has seen fit to mandate the discharge of a worker who twice tests positive for drugs. We hesitate to infer a public policy in this area that goes beyond the careful and detailed scheme Congress and the Secretary have created.

We recognize that reasonable people can differ as to whether reinstatement or discharge is the more appropriate remedy here. But both employer and union have agreed to entrust this remedial decision to an arbitrator. We cannot find in the Act, the regulations, or any other law or legal precedent an "explicit," "well defined," "dominant" public policy to which the arbitrator's decision "runs contrary." *Misco*, 484 U. S., at 43; *W. R. Grace*, 461 U. S., at 766. We conclude that the lower courts correctly rejected Eastern's public policy claim. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I concur in the Court's judgment, because I agree that no public policy prevents the reinstatement of James Smith to his position as a truck driver, so long as he complies with the arbitrator's decision, and with those requirements set out in the Department of Transportation's regulations. I do not endorse, however, the Court's statement that "[w]e agree, in principle, that courts' authority to invoke the public policy exception is not limited solely to instances where the arbitra-

tion award itself violates positive law." *Ante,* at 63. No case is cited to support that proposition, and none could be. There is not a single decision, since this Court washed its hands of general common-lawmaking authority, see *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), in which we have refused to enforce on "public policy" grounds an agreement that did not violate, or provide for the violation of, some positive law. See, *e. g., Hurd* v. *Hodge,* 334 U. S. 24 (1948) (refusing to enforce under the public policy doctrine a restrictive covenant that violated Rev. Stat. § 1978, 42 U. S. C. § 1982).

After its dictum opening the door to flaccid public policy arguments of the sort presented by petitioner here, the Court immediately posts a giant "Do Not Enter" sign. "[T]he public policy exception," it says, "is narrow and must satisfy the principles set forth in *W. R. Grace," ante,* at 63, which require that the applicable public policy be "explicit," "well defined," "dominant," and "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests,'" *W. R. Grace & Co.* v. *Rubber Workers,* 461 U. S. 757, 766 (1983) (quoting *Muschany* v. *United States,* 324 U. S. 49, 66 (1945)). It is hard to imagine how an arbitration award could violate a public policy, identified in this fashion, without actually conflicting with positive law. If such an award could ever exist, it would surely be so rare that the benefit of preserving the courts' ability to deal with it is far outweighed by the confusion and uncertainty, and hence the obstructive litigation, that the Court's Delphic "agree[ment] in principle" will engender.

The problem with judicial intuition of a public policy that goes beyond the actual prohibitions of the law is that there is no way of knowing whether the apparent gaps in the law are intentional or inadvertent. The final form of a statute or regulation, especially in the regulated fields where the public policy doctrine is likely to rear its head, is often the

result of compromise among various interest groups, resulting in a decision to go so far and no farther. One can, of course, summon up a parade of horribles, such as an arbitration award ordering an airline to reinstate an alcoholic pilot who somehow escapes being grounded by force of law. But it seems to me we set our face against judicial correction of the omissions of the political branches when we declined the power to define common-law offenses. See *United States* v. *Hudson*, 7 Cranch 32 (1812). Surely the power to invalidate a contract providing for actions that are not contrary to law (but "ought" to be) is less important to the public welfare than the power to prohibit harmful acts that are not contrary to law (but "ought" to be). And it is also less efficacious, since it depends upon the willingness of one of the parties to the contract to *assert* the public policy interest. (If the airline is not terribly concerned about reinstating an alcoholic pilot, the courts will have no opportunity to prevent the reinstatement.) The horribles that can be imagined—if they are really so horrible and ever come to pass—can readily be corrected by Congress or the agency, with no problem of retroactivity. Supervening law is always grounds for the dissolution of a contractual obligation. See Restatement (Second) of Contracts § 264 (1979).

In sum, it seems to me that the game set in play by the Court's dictum endorsing "in principle" the power of federal courts to enunciate public policy is not worth the candle. Agreeing with the reasoning of the Court except insofar as this principle is concerned, I concur only in the judgment.