# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1219

_____

Entergy Operations, Inc.

*Plaintiff - Appellant*

v.

United Government Security Officers of America International Union; United Government Security Officers of America Local 23

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: December 13, 2016
Filed: May 9, 2017

_____

Before WOLLMAN, SMITH,[1] and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Entergy Operations, Inc. ("Entergy") terminated Michael Phillips—a security officer at a nuclear power plant—because it thought he could not satisfy a job

---

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

requirement that he pass a "fit test" for a full-face gas mask. Phillips's job requires him to be ready, in coordination with others, to repel an armed chemical attack on the plant while wearing the mask. But Phillips has chronic folliculitis. If he shaves too often, his hair follicles become infected or inflamed. Entergy thought this would keep Phillips from shaving often enough to properly wear the mask. An arbitrator ordered Phillips reinstated, largely because Entergy never fit-tested Phillips with facial hair before concluding that it disqualified him from the position. Because Entergy could have reassigned Phillips to a position that did not require a gas mask, and because the arbitrator arguably applied Entergy's collective bargaining agreement, we affirm the district court's[2] decision to uphold the arbitration award.

## I. *Background*

Arkansas Nuclear One near Russellville, Arkansas, is subject to numerous federal regulations intended to protect nuclear power plants from "[r]adiological sabotage" carried out by "[w]ell-trained . . . and dedicated individuals, willing to kill or be killed" and involving "incapacitating agents and explosives for use as tools of entry." 10 C.F.R. § 73.1(a)(1)(i)(A),(D). The Nuclear Regulatory Commission promulgates these regulations. The Commission sets broad guidelines and tasks each nuclear-power-plant licensee with developing a plant-specific protection plan. *See* 10 C.F.R. § 73.55(b)(1). Entergy is the licensee for Arkansas Nuclear One.

Entergy signed a collective bargaining agreement with the United Government Security Officers of America, Local 23 ("Union"), to provide guard services. The agreement covers a single category of worker: nuclear security officer. Phillips was such an officer. After a year on the job, Phillips was ordered to report to the training department for respirator fit-testing on November 13, 2012. At the time, Phillips had

---

[2]The Honorable Joe J. Volpe, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was referred for final disposition by consent of the parties under 28 U.S.C. § 636(c).

what Entergy describes as a "full goatee." Senior Technical Training Instructor David Rasmussen, relying on federal regulations, told Phillips that he could not be fit-tested with facial hair.

A week later, Phillips's doctor diagnosed him with chronic folliculitis. Phillips saw an Entergy doctor, Dr. Andrew Monfee, in December. Dr. Monfee confirmed the diagnosis. He told Entergy that Phillips's condition could be avoided by not shaving his upper lip and chin, though he could shave often enough to limit his facial hair in these areas to 3–4mm. Dr. Monfee also opined that these areas of facial hair would not be in the sealing area of the respirator that Phillips was required to wear. Days later, Dr. Monfee updated his letter, noting that after speaking with Entergy security personnel, he now understood that the "inner chin cup" of the respirator is part of the seal, and that Phillips would not be allowed to have any hair in that area.

Entergy temporarily reassigned Phillips to train new recruits while it tried to find him an alternative respirator or position. By late January 2013, Entergy had found neither, and it terminated Phillips.

Phillips filed a grievance and the dispute went to arbitration. In March 2015, an arbitrator found that Entergy lacked just cause to terminate Phillips. The arbitrator's decision turned on two principal facts. First, Entergy never fit-tested Phillips with 3–4mm of facial hair to see whether he could pass. The arbitrator noted that Entergy "refused to provide empirical tests by the application of the mask to [Phillips]'s face . . . . The only manner to determine if [Phillips] can obtain a positive seal is by an actual fit-test." Thus, the arbitrator said, Phillips "should be allowed to undergo a fit-test to lay to rest any argument as to whether or not his condition can be accommodated through the use of any currently available respirator." Second, the arbitrator pointed out that "[t]here are Post assignments at [Arkansas Nuclear One] that do not require the use of a respirator/mask." So "[t]he Company position that obtaining a proper face to facepiece seal on a respirator is an essential function of all

[Arkansas Nuclear One] Nuclear Security Officers is not supported by the record." This finding relied on Security Manager Josh Toben's testimony that officers assigned to two particular posts, the Sally Port and the SOCA Port, are not required to wear a respirator. Toben also testified that the officers assigned to those posts do not routinely rotate between other posts.

The arbitrator ordered Phillips reinstated with backpay. It also ordered Entergy, "upon successful completion of respirator fit-testing, [Arkansas Nuclear One] Tactical Qualification Course and a review of [Phillips's] diagnosed medical condition," to provide Phillips with an acceptable respirator or a reasonable accommodation. The arbitrator was clear, though, that Phillips had to meet basic requirements: "[Phillips] should not view this decision as approval to continuously remain unshaven. He is reminded herein that he must meet the annual respirator fit-testing and Tactical Qualification Course requirements."

Entergy sued to vacate the award on the grounds that it violated public policy and that the arbitrator exceeded his authority. The district court granted summary judgment to the Union, which represents Phillips in this litigation. The district court concluded that it could not rule in Entergy's favor "without some evidence to show Mr. Phillips's medical condition prevents him from properly wearing his respirator." Because Entergy did not fit-test Phillips, the court could not find any regulatory violation, and therefore it could not find that the award violated public policy. The court mentioned, but did not address in detail, Entergy's alternative argument that the arbitrator exceeded his authority.

II. *Discussion*

A. *Public Policy*

We review de novo the district court's decision to uphold the arbitrator's award. *Homestake Mining Co. v. United Steelworkers of Am.*, 153 F.3d 678, 680 (8th Cir. 1998). We accept the facts as found by the arbitrator, but we review his legal

-4-

conclusions de novo to determine whether the award violates public policy. *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Brotherhood of Elec. Workers*, 834 F.2d 1424, 1427 (8th Cir. 1987). Only a "well defined and dominant" public policy arising from "laws and legal precedents" will trump an arbitration award—"general considerations of supposed public interests" are not enough. *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983) (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)). And in employment cases, the question is not whether the employee's underlying actions violated public policy, but whether his reinstatement will. *E. Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62–63 (2000).

Entergy contends that federal nuclear powerplant regulations establish public policy governing facial hair and respirator use. The following is an overview of the relevant regulations. One covers general interference with a respirator's seal:

> The licensee shall ensure that no objects, materials or substances, such as facial hair, or any conditions that interfere with the face—facepiece seal or valve function, and that are under the control of the respirator wearer, are present between the skin of the wearer's face and the sealing surface of a tight-fitting respirator facepiece.

10 C.F.R. § 20.1703(h) (2012). Another speaks more clearly to facial hair:

> The employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have . . . [f]acial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function . . . .

29 C.F.R. § 1910.134(g)(1)(A) (2012). An appendix to that regulation specifies how fit-tests are to be done—or rather are not to be done:

The test shall not be conducted if there is any hair growth between the skin and the facepiece sealing surface, such as stubble beard growth, beard, mustache or sideburns which cross that respirator sealing surface.

29 C.F.R. § 1910.134, App. A, Pt. I A.9. And one of the Commissions's regulatory guides—which is non-binding but nonetheless gives the Commission's view—is even more direct:

Anything in the face-to-facepiece seal area of a tight-fitting respirator that is under the control of the respirator user is prohibited by 10 CFR 20.1703(h). . . . The list of prohibited materials includes (but is not necessarily limited to) facial hair of any kind in the seal area (the worker must be clean-shaven) . . . .

Nuclear Regulatory Commission, Regulatory Guide 8.15, § 6.2 (1999).

Entergy argues that these regulations prohibit fit-testing Phillips with 3–4mm of facial hair on his chin. We need not decide whether fit-testing Phillips with facial hair would violate federal law. If Entergy may employ Phillips in a post that does not legally require a respirator, then the respirator/facial hair conflict disappears. The arbitrator found such a post: "[O]fficers assigned to the Sally Port or the SOCA Port are not required to wear a respirator." The officers assigned to these posts are serving not as an "armed responder," but as an "armed security officer." According to the arbitrator's findings, if the plant were attacked, "those officers assigned to either the Sally Port or the SOCA Port would remain at the respective Port Post." The officers at these posts do not routinely rotate among other posts.

Entergy contends that these two non-respirator posts are too intertwined with the armed-responder posts for this to be a workable solution. There are two problems with this argument. The first is that to adopt Entergy's position, we would have to review and overturn the arbitrator's fact findings, which we may not do. *See Iowa*

*Elec. Light & Power Co.*, 834 F.2d at 1427. The arbitration testimony, moreover, supports the arbitrator's conclusions. Security Manager Toben testified as follows:

> Q. Are there duties that security officers do that do not require an armed response?
>
> A. There are armed security officers and armed responders. I'll be fairly general . . . .
>
> So in general armed responders are responsible to stay on site, which is in the protected area, and are required to have a gas mask. Armed security officers are another portion of our strategy that can be outside of the protected area and don't have to always have a gas mask. They need to have one readily available.
>
> We have people working, like I'm sure you know, in the sally port that don't have to have a gas mask.

Asked whether an officer working at the Sally Port or the SOCA Port would stay there during an attack, Toben answered: "They would stay there." The reason, Toben made clear, is that "the guys at the sally port aren't necessarily part of the integral [response] strategy necessary to implement." (Toben seems to have been referring to the written response strategy that Entergy is required to submit to the Commission.) It is true that Toben said there would be institutional pressure to join the fight, but that is not the same as a legal pressure, which is the concern of public policy.

The second problem with Entergy's argument is that the difficulties it asserts are not matters of federal law, but of Entergy practice. Entergy has not argued that its own practice—that is, not requiring officers at the Sally and SOCA ports to have respirators—violates federal law. And at oral argument, Entergy conceded that the alleged need for all officers to be interchangeable rather than assigned to particular posts arises from the parties' bargaining agreement, not from federal law. Asked

whether there is a federal regulation that requires all of Entergy's security officers to have essentially the same respirator requirements, counsel for Entergy answered: "I don't believe there's anything that specific; it's just the manner in which we're set up." Entergy noted that it could, consistent with federal law, have light-duty positions that do not require a respirator.

Entergy also seizes on the arbitrator's apparently contradictory findings about the respirator requirement. Before finding that certain posts did not require a respirator, the arbitrator found that all nuclear security officers at the plant must be given respirators, must be able to quickly put them on, and must be able to provide an armed response while wearing them. This finding, however, does not contradict the arbitrator's alternative-post finding. The arbitrator made this finding in the background section of his opinion, while discussing the training required of all officers. All Entergy officers undergo the same training, but they do not carry out the same duties. Phillips, as the arbitrator found, can shave for a fit-test, and presumably can meet the non-respirator training requirements (no one argues otherwise). Phillips's facial hair becomes a problem if continued respirator use is required. But if there is a post that Phillips can man without continued use of a tight-fitting respirator—and on this record we must conclude that there is—then Entergy will not violate federal law by placing Phillips in that post. This might not be Entergy's preference, but it agreed to have an arbitrator resolve this issue, and it has not persuaded us that its own staffing practices violate federal law.

## B. *Arbitrator's Authority*

Entergy also argues that the arbitrator exceeded his authority. A party making this argument bears a heavy burden. *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013). Entergy bargained for the arbitrator's interpretation of its contract. If the arbitrator even arguably interpreted and applied the agreement, then we must uphold the award. *Id.* The narrow exception to this rule is when the arbitrator "'act[s] outside the scope of his contractually delegated authority'—issuing an award

that 'simply reflect[s] [his] own notions of [economic] justice' rather than 'draw[ing] its essence from the contract.'" *Id.* (alterations original) (quoting *E. Associated Coal Corp.*, 531 U.S. at 62)). To put it another way, the arbitrator cannot ignore or amend the parties' agreement. *Excel Corp. v. United Food & Commercial Workers Int'l Union*, 102 F.3d 1464, 1468 (8th Cir. 1996).

Entergy first contends that the arbitrator exceeded his authority by requiring Entergy to violate federal regulations. But as we noted above, the arbitrator did not do so. Next Entergy argues that the arbitrator required Entergy to disregard the bargaining agreement's testing-and-training provision. This provision, according to Entergy, allows Entergy to require industry-standard—and legally-required—testing and training. The agreement, though, speaks of testing and training only in general, and Entergy has not shown that respirator testing and training are required for all positions, particularly when not relevant to the position. Entergy also argues that the arbitrator ordered Phillips reinstated to a position that does not exist. Yet this argument contradicts the arbitrator's finding that an alternative position did exist, and we must accept that finding.

Entergy's remaining arguments focus on the alleged divergence between the bargaining agreement's single job category and the arbitrator's findings about multiple, different posts. According to Entergy, the agreement does not contemplate permanent placement in the Sally or SOCA ports, and the arbitrator's award therefore forces Entergy to create a new position. Entergy correctly points out that the bargaining agreement envisions one broad job category, but Entergy's actual practice established differences between various posts. The arbitrator did not alter or contradict the bargaining agreement by relying on Entergy's actual practice in staffing the posts. (Entergy does not argue that its own practice is inconsistent with the agreement.) Also, the arbitrator was discussing the implications of placing Phillips at the Sally or SOCA ports in the context of the bargaining agreement's accommodation provision. The arbitrator therefore did not stray outside his authority

to interpret and apply the contract. The award was within the range of possibilities that Entergy bargained for.

## III. *Conclusion*

Accordingly, we affirm the district court's judgment.

————————————————