249 F.3d 1089 (9th Cir. 2001)
 TEAMSTERS LOCAL UNION 58, PLAINTIFF-COUNTER-DEFENDANT-APPELLANT,
v.
BOC GASES, A DIVISION OF THE BOC GROUP, INC.; THE BOC GROUP, INC., DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES.
TEAMSTERS LOCAL UNION 58, PLAINTIFF-COUNTER-DEFENDANT-APPELLEE,
v.
BOC GASES, A DIVISION OF THE BOC GROUP, INC.; THE BOC GROUP, INC., DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS.
 Nos. 98-35573, 98-35845
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued February 12, 2000
Submitted March 19, 2001
Filed May 16, 2001
 
 Bruce R. Colven, Morse & Bratt, Vancouver, Washington, for the plaintiff-counter-defendant-appellant-cross-appellee.
 Bradley W. Kampas and Seth L. Neulight, Jackson, Lewis, Schnitzler & Krupman, San Francisco, California, for the defendants-counter-claimants-appellees-cross-appellants.
 Appeal from the United States District Court for the Western District of Washington Franklin D. Burgess, District Judge, Presiding. D.C. No. CV-97-05114 (FDB)
 Before: Stephen S. Trott, Andrew J. Kleinfeld, and Barry G. Silverman, Circuit Judges.
 
 Silverman, Circuit Judge
 
 1
 For eight years, Tim Kilby, a member of the Teamsters Union, drove a delivery truck for BOC Gases, an industrial distributer of hazardous gases. During his tenure, Kilby experienced his share of occupational mishaps. But these incidents paled in comparison to the comedy of errors that characterized his last delivery for BOC.
 
 I. FACTS AND PROCEDURAL HISTORY
 A. The SEH Delivery
 
 2
 The star-crossed events began with Kilby's arrival at SEH America, a microchip manufacturer which had requested a supply of oxygen. In typical fashion, he connected his truck's oxygen tank to SEH's dedicated storage facility. As he started to download the gas, however, he noticed a problem. The power take off valve on his truck, a device which regulates the flow of oxygen, was shutting off prematurely, preventing him from filling SEH's tank. Unable to repair the valve, Kilby called the BOC truck shop and requested an on-site mechanic. The shop attendant declined his request, instead suggesting a make-shift solution. The attendant instructed Kilby to rev the truck's engine, theorizing that the additional power would open the valve. Although simple in principle, this temporary fix proved difficult in application.
 
 
 3
 During the course of the delivery, the valve malfunctioned approximately fourteen times. On each occasion, Kilby had to run fifty feet from the back of the truck, climb into the cab, and rev the engine to keep the oxygen pumping. Because the pump lost pressure each time the valve closed, he was forced to estimate how much oxygen had been delivered. Satisfied that he had filled SEH's tank, Kilby prepared the delivery paperwork and obtained a sign-off from an SEH employee.
 
 
 4
 Still reeling from the mini-sprints, Kilby returned to the cab to find his lunch bucket overturned. As he scrambled to salvage the contents, Kilby felt an alarming sensation: The truck was moving! Panicked, he tugged at the emergency brake, stopping the truck instantly. Overcome by the events, Kilby became nauseated and vomited.
 
 
 5
 With the roll-away averted, Kilby composed himself, started the truck and began to pull away. Unfortunately, he did not get very far. A tugging resistance slowed the truck's progress. Kilby stopped the truck, exited the cab and circled the perimeter searching for the cause. As he reached the rear of the truck, he discovered the problem: Kilby had neglected to disconnect the truck hose. His mistake caused approximately $17,000 in damages to SEH's storage facility.
 
 
 6
 SEH responded with a letter to BOC's management instructing them not to assign Kilby to deliver oxygen to SEH in the future. SEH described the damage to their tank as "substantial" and criticized Kilby's failure to communicate the incident to SEH personnel as "inexcusable." BOC suspended Kilby pending further investigation.
 
 
 7
 One week after the incident, BOC fired Kilby. In its termination letter, BOC asserted two grounds supporting his discharge. First, BOC accused Kilby of dishonesty, contending that he "failed to accurately relay" the extent of the damage to the SEH storage tank. Second, BOC stated that his failure to disconnect the transfer hose constituted "gross carelessness." Teamsters challenged Kilby's termination by filing a grievance on his behalf, and the dispute was referred to arbitration.
 
 B. The Arbitrator's Initial Award
 
 8
 From the outset, the arbitrator expressed his reluctance "to interfere with [BOC's] disciplinary action " unless the evidence showed that Kilby's termination was "at odds with" the parties' Collective Bargaining Agreement (CBA). The CBA provision governing discharges provides:
 
 
 9
 [BOC] shall not discharge any [Teamsters ] employee without just cause, but in respect to discharge shall give at least one (1) warning notice of complaint against such employee, in writing, . . . except that no warning notice need be given to an employee before he is discharged if the cause of such discharge is dishonesty, . . .[or] gross carelessness resulting in an accident. Cause for immediate discharge shall include the preceding referenced serious offenses but are not limited to those listed.
 
 
 10
 (Emphasis added.)
 
 
 11
 Noting that gross carelessness and dishonesty were both grounds for Kilby's immediate termination under the CBA, the arbitrator reviewed the evidence supporting these charges. The arbitrator defined gross carelessness as "actions taken knowingly in wanton or willful disregard of consequences." Comparing Kilby's conduct, the arbitrator ruled that while Kilby's failure to disconnect the transfer hose was"clearly careless", his actions were neither willful nor wanton. With respect to the dishonesty charge, the arbitrator found no evidence that Kilby intentionally withheld information regarding the SEH incident.
 
 
 12
 The arbitrator concluded that Kilby was improperly discharged under the CBA and ordered him reinstated with partial backpay. However, cognizant of Kilby's checkered work history and recent heart surgery, the arbitrator stated that Kilby's reinstatement was "subject to passing a mental and physical examination to determine his fitness [to perform his duties]."
 
 C. The Medical Exams
 
 13
 Kilby's physical exam was administered by Douglas Dawley, M.D., a cardiologist. Without reservation, Dr. Dawley cleared Kilby to return to work, concluding that he was "capable of physically performing his job."
 
 
 14
 Ronald M. Turco, M.D., a psychiatrist, conducted Kilby's mental exam. Although Dr. Turco found that Kilby was"psychologically capable of driving a truck under usual circumstances," he questioned Kilby's competence to drive a hazardous gas truck because, in Dr. Turco's words, he was "especially concerned that [Kilby] left his coat in my waiting room," describing Kilby's oversight as "the kind of behavior that we are concerned about." Stressing the need for a "more specific" evaluation, Dr. Turco recommended that Kilby undergo a neuropsychological exam by Laurence Binder, Ph.D.
 
 
 15
 Dr. Binder conducted a battery of tests designed to probe Kilby's mental fitness from a neuropsychological perspective. In his report, Dr. Binder stated that while the tests revealed some "isolated neuropsychological abnormalities, " he considered the results to be "essentially normal."
 
 
 16
 BOC then asked Robert Thornton, M.D., the physician who regularly evaluated BOC's drivers, to interpret Kilby's exam results and offer his recommendation. Reviewing Dr. Dawley's report, Dr. Thornton concluded that Kibly was physically fit to drive commercial trucks. However, he cautioned that because Dr. Turco had not qualified Kilby to drive trucks carrying hazardous materials, Kilby's duties should be "limited to non-hazardous loads."
 
 
 17
 Following Dr. Thornton's recommendation, BOC suspended Kilby. Teamsters challenged the suspension, and the dispute was referred back to the arbitrator to determine whether Kilby was mentally and physically fit to resume his duties.
 
 D. The Arbitrator's Supplemental Award
 
 18
 The arbitrator reviewed the medical reports and issued a supplemental award. The arbitrator refused to consider Dr. Thornton's recommendation, finding that he was not a neutral expert. Examining the other physicians' evaluations, the arbitrator concluded that "with varying degrees of enthusiasm, all conclude Kilby is fit to resume his former duties as a driver."
 
 
 19
 The arbitrator discounted Dr. Turco's statements questioning Kilby's fitness to drive a truck containing hazardous materials. The arbitrator found that Dr. Turco based his "impression" mainly upon Kilby's having forgotten his jacket at Dr. Turco's office. Refusing to accept the jacket incident as a barometer of Kilby's mental health, the arbitrator relied on Dr. Binder's neuropsychological evaluation describing Kilby as "essentially normal."
 
 
 20
 Finding that Kilby was physically and mentally fit to perform his duties, the arbitrator ordered him reinstated. However, BOC refused to reinstate Kilby, and Teamsters filed suit in federal court to enforce the arbitrator's awards.
 
 
 21
 E. The District Court's Order Vacating the Arbitrator's Awards
 
 
 22
 The district court concluded that the arbitrator's awards "failed to draw their essence from the CBA." Moreover, the court found that the awards violated "public policy distinguishing commercial drivers of inert materials from those who transport materials." Accordingly, the court vacated the awards and remanded the dispute to the arbitrator. Teamsters appealed.
 
 II. STANDARD OF REVIEW AND JURISDICTION
 
 23
 We review de novo the district court's order vacating the arbitration award. See Meiji Market v. United Food & Commercial, 789 F.2d 1334, 1335 (9th Cir. 1986). We have jurisdiction under 28 U.S.C. §§ 1291, and we reverse.[1]
 
 III. ANALYSIS
 
 24
 BOC argues that the arbitrator's awards failed to draw their essence from the CBA. We disagree.
 
 
 25
 Courts accord an arbitrator's decision a "nearly unparalleled degree of deference." Stead Motors v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1204 (9th Cir. 1989) (en banc). Indeed, we must defer to the arbitrator's decision "as long as the arbitrator even arguably constru[ed ] or appl[ied] the contract." United Paperworkers Int'l Union v. Misco, Inc. 484 U.S. 29, 38 (1997). Only where the arbitrator ignores the contract's plain language, choosing instead to impress his own brand of industrial justice, may we question his judgment. Id.
 
 
 26
 BOC argues that the arbitrator ignored the CBA by refusing to recognize BOC's right to terminate Kilby for"non-listed" offenses. As evidence of the arbitrator's oversight, BOC cites the arbitrator's failure to consider Kilby's breach of company procedures as an independent basis for his discharge.
 
 
 27
 Contrary to BOC's assertion, the arbitrator's award clearly recognizes BOC's right to terminate Kilby for "nonlisted" offenses, quoting the relevant portions of the CBA verbatim. The arbitrator did not consider any "non-listed" offenses because none was raised.
 
 
 28
 BOC's termination letter states two grounds for Kilby's discharge: dishonesty and gross carelessness. While BOC noted Kilby's breach of company procedures, it did so only in the context of advancing its gross carelessness claim. The arbitrator carefully evaluated Kibly's conduct, including his violation of company procedures, and concluded that his actions did not constitute gross carelessness under the CBA. Having bargained for the arbitrator's determination, BOC cannot defeat it with bald assertions that the arbitrator ignored the CBA. To overturn the award, BOC bore the heavy burden of demonstrating that the arbitrator failed to even arguably construe or apply the CBA. Misco, 484 U.S. at 38. We conclude that BOC failed to do so.
 
 
 29
 Alternatively, BOC argues that the arbitrator's award violated public policy, contending that Kilby is not mentally fit to drive trucks containing hazardous materials. We reject BOC's contention.
 
 
 30
 Courts may not enforce arbitration awards that violate an "explicit, well-defined, and dominant" public policy. W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (1983). However, as the Supreme Court recently cautioned, courts cannot discern public policy from "general considerations and supposed public interests." Eastern Associated Coal Corp. v. United Mine Workers, Dist. 17, 121 S.Ct. 462, 466 (2000) (finding no public policy precluding the enforcement of an arbitrator's award reinstating a truck driver who had twice tested positive for marijuana). Instead, public policy must "be ascertained by reference to the laws and legal precedents." Id.
 
 
 31
 BOC contends that embodied in a litany of federal regulations governing the transportation of hazardous material, a dominant public policy exists mandating that commercial truck drivers be physically and mentally fit to perform their duties. Even assuming that to be true, it is of no help to BOC because the arbitrator found as a matter of fact that Kilby was mentally and physically fit to perform his duties. The parties agreed to have the arbitrator determine whether Kilby was mentally and physically fit to drive a truck carrying hazardous material. Weighing the opinions of several qualified physicians and a psychologist, the arbitrator found that he was. This factual finding is beyond the scope of our limited review. See Stead Motors, 886 F.2d at 1209. Thus, even if we were to find a public policy governing commercial truck drivers' fitness, we could not conclude that the arbitrator's award violated it.
 
 IV. CONCLUSION
 
 32
 The judgment of the district court is REVERSED and REMANDED. On remand, the district court is instructed to issue an order confirming the arbitrator's awards.
 
 
 
 Notes:
 
 
 [1]
 Because we reverse the district court's order vacating the arbitration award, we need not consider BOC's cross-appeal.