*703 OPINION OF THE COURT
William A. Wetzel, J.
Introduction
Petitioner brings this proceeding pursuant to article 75 of the CPLR seeking to confirm the award of an arbitrator reinstating one of its union members to his position as a deckhand on the Staten Island Ferry. Respondent cross-moves to dismiss the petition and vacate the arbitration award.
The employee Steven Bonamo was employed by respondent with the title of deckhand, which is by definition a “safety-sensitive position.” The job description for the position specifies, inter alia, that a deckhand must “be capable of climbing ladders on the ferry and responding quickly to various emergencies and situations.” (See exhibit 2 to respondent’s answer.)
An arbitrator found that Bonamo “refused to submit to a random drug test,” which is the equivalent of having failed such a test. The arbitrator went on to conclude that Bonamo should be suspended and reinstated rather than terminated.
Petitioner argues that controlling precedents place the arbitration decision beyond judicial review. This court, however, strenuously disagrees and concludes that, for the reasons stated below, the award of the arbitrator reinstating Bonamo exceeded the arbitrator’s authority, is against public policy, is irrational, and is devoid of any modicum of common sense.
On October 15, 2003, Richard J. Smith was piloting the ferryboat Andrew J. Barberi while under the influence of medically prescribed drugs when the ferry crashed into a concrete maintenance pier near the terminal on Staten Island. The impact ripped open the side of the vessel, killing 11 passengers and maiming scores of the 1,500 passengers on board. This was one of the worst mass transit disasters in the history of New York City.
On January 9, 2006, Mr. Smith was sentenced upon a plea of guilty in the United States District Court to 11 counts of seaman’s manslaughter. His supervisor, Patrick Ryan, pleaded guilty to the crime of failing to enforce the rules and regulations. Both were sentenced to prison. Two other individuals have also pleaded guilty.
There are over 200 pending civil actions seeking damages literally in the billions of dollars. In a report issued by the National Transportation Safety Board (NTSB), the City was found to have failed to exercise appropriate oversight, and the NTSB chairman characterized this catastrophe as “a wake-up call to all modes of transportation.”
*704 The Federal Regulations Governing Public Employees in Safety-Sensitive Positions Who Refuse to Submit to Random Drug and Alcohol Tests
Pursuant to federal regulations issued by the United States Department of Transportation (USDOT), employees in “safety-sensitive positions” are subject to random drug testing. (46 CFR 16.230.) The USDOT requires employers that become aware of a verified positive drug test to immediately remove the employee from performing safety-sensitive functions. (See 49 CFR 40.23.)
The Department of Transportation of the City of New York (City or DOT) conducts random drug and alcohol testing of its employees pursuant to federal regulations promulgated by the USDOT. (See 49 CFR part 40.) In response to the NTSB report and consistent with those regulations, DOT enacted a zero tolerance policy for positive drug and alcohol test results (zero tolerance policy). The zero tolerance policy provides:
“DOT shall seek the termination of any employees in the following safety sensitive job titles who perform work related to the Staten Island Ferry and receive a first time verified positive result for a drug or alcohol test administered pursuant to regulations promulgated by the United States Department of Transportation . . . under the authority of the Omnibus Transportation Employee Testing Act of 1991: boilermaker; supervisor boilermaker; captain; assistant captain; deckhand” (emphasis added).
Under DOT’s zero tolerance policy, refusal to submit to a drug or alcohol test constitutes a verified positive result requiring termination. Title 49 provides a detailed procedure for determining what constitutes a refusal to submit to a drug or alcohol test.
DOT’s Random Drug and Alcohol Test and Bonamo’s Refusal
Bonamo was employed by DOT in the title of deckhand on the Staten Island Ferry from March 1997 until his termination, effective July 3, 2004. A deckhand performs duties in accordance with DOT operating procedures and United States Coast Guard regulations on a municipal ferry vessel and at a ferry terminal. Federal regulations define deckhand as a safety-sensitive position.
DOT distributed its zero tolerance policy to its employees on April 8, 2004. On April 16, 2004, Bonamo, while employed by *705 DOT as a deckhand, was directed to submit to a random drug and alcohol test. Bonamo, however, failed to provide a sufficient urine sample to be tested. On April 27, 2004, in accordance with 49 CFR 40.193 (c), a physician employed by the testing laboratory evaluated Bonamo to determine if there was any medical explanation for his inability to provide a sufficient urine specimen. After his examination, the physician determined there was no medical explanation for Bonamo’s inability to provide an adequate urine sample. After reviewing the test results and the physician’s determinations, Jeffrey Altholz, the medical review officer for the testing company, determined that pursuant to federal regulations Bonamo was deemed to have “refused to test.” According to DOT’s zero tolerance policy, this refusal to submit to a drug or alcohol test, as defined in federal regulations, constituted a positive result. (See 49 CFR part 40; see also DOT’s zero tolerance policy.) The arbitrator explicitly agreed with this conclusion in his award.
Disciplinary Proceedings
On April 26, 2004, Bonamo was suspended without pay from his duties as a deckhand, pending the outcome of an official investigation. On April 28, 2004, the Advocate General’s Office of DOT served charges on Bonamo. On May 14, 2004, an informal conference was held, at which the conference leader found that all charges were substantiated and recommended Bonamo’s termination.
On May 20, 2004, Bonamo filed an appeal of the conference leader’s decision through his union in accordance with the contractual grievance procedure contained in the Marine collective bargaining agreement. Bonamo’s suspension ended by operation of law on May 26, 2004, and he was reinstated to the payroll pending the outcome of the appeal, but was not permitted to return to the position of deckhand.
An evidentiary hearing was held on June 24, 2004, at DOT’s Office of Labor Relations before Gordon L. Goldberg, the director of labor relations. Bonamo was represented by counsel at the hearing. The main issue at the hearing was the determination that Bonamo had refused to submit to the random alcohol and drug tests of April 16, 2004. Director Goldberg determined that the agency had met its burden of proof in this regard and ordered Bonamo’s immediate termination. Bonamo was terminated effective July 3, 2004.
*706 Arbitration
Pursuant to the grievance procedure in the collective bargaining agreement, Bonamo appealed Director Goldberg’s decision. Local 333, United Marine Division, ILA, AFL-CIO, CLC (collectively the Union) and DOT were parties to the arbitration. The arbitration hearing was held on March 15, 2005 and July 18, 2005, with arbitrator Richard J. Roth presiding. The issue presented to arbitrator Roth was: Did the Department of Transportation wrongfully terminate the employment of Steven Bonamo in violation of article VI, section 1 (e) of the Marine collective bargaining agreement? If so, what shall be the remedy? (See award, respondent’s exhibit 1.)
Again, the main factual issue driving the union’s appeal was whether Bonamo refused to submit to the random drug and alcohol tests. Both sides presented their evidence and according to arbitrator Roth, “[e]ach party had full opportunity to present witnesses, to examine and cross-examine the witnesses, and to present exhibits and arguments to the arbitrator.”
In his opinion and award, arbitrator Roth stated:
“I must thus conclude that Mr. Bonamo refused to submit to a random drug test and under the DOT’s recent zero tolerance drug policy the DOT normally would have the right to terminate an employee. However, given the fact that the Union was unable to examine the circumstances under which the testing was done, I have found that there were mitigating circumstances that warrant reduction of the penalty of termination to that of a suspension” (emphasis added).
In short, the arbitrator concluded that Bonamo had indeed refused to submit to a random drug test, but nullified the City’s decision to terminate him pursuant to DOT’s zero tolerance policy. Instead, the arbitrator ordered Bonamo’s reinstatement or “reduction of the penalty,” to use his words.
Discussion
The principles governing confirmation of labor arbitration awards are well established. The United States Supreme Court and the New York Court of Appeals have repeatedly stated that a court’s function in reviewing such an award is limited. (Paperworkers v Misco, Inc., 484 US 29, 36 [1987]; Steelworkers v Enterprise Wheel & Car Corp., 363 US 593, 596-599 [I960]; Matter of New York City Tr. Auth. v Transport Workers Union of *707 Am., Local 100, AFL-CIO, 99 NY2d 1, 6 [2002]; Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York, 94 NY2d 321, 326 [1999].) Because federal and New York State policy strongly favors resolution of labor disputes by arbitration, a court may not review the merits of a labor arbitration award, even in circumstances where an arbitrator makes an error of law or fact. (Misco, Inc., 484 US at 36; Enterprise Wheel & Car Corp., 363 US at 596; Transport Workers Union of Am., 99 NY2d at 7-9 [discussing New York’s Taylor Law and policy of encouraging public employers and employee organizations to agree on grievance procedures to foster stable labor relations].)
Although the policy favoring arbitration of labor disputes is strong, it is neither sacrosanct nor absolute; as with all principles, it has its limits. A court may refuse to confirm an arbitrator’s award if the arbitrator acted outside the scope of his authority (Eastern Associated Coal Corp. v Mine Workers, 531 US 57, 62 [2000], citing Misco, Inc., 484 US at 38). Additionally, courts may vacate any arbitration award that “violates a strong public policy, is irrational or clearly exceeds a specifically enumerated limitation on an arbitrator’s power under CPLR 7511 (b) (1).” (New York State Correctional Officers & Police Benevolent Assn., 94 NY2d at 326.) Generally, “the ‘ “scope of [an arbitrator’s] authority . . . depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.” ’ ” (Synergy Gas Co. v Sasso, 853 F2d 59, 63-64 [2d Cir 1988], cert denied 488 US 994 [1988], quoting Ottley v Schwartzberg, 819 F2d 373, 376 [1987].)
The Union points to no place in article VI, section 1 (e) of the Marine collective bargaining agreement that grants arbitrator Roth the authority to reinstate an employee who refuses to submit to a drug and alcohol test to a safety-sensitive position. Nor does the parties’ submission of the dispute grant arbitrator Roth the authority to do so. Again, the question before the arbitrator was whether Bonamo was wrongfully terminated, not whether DOT had the right to terminate him.
The record reflects that the parties were in agreement that the question presented to arbitrator Roth was whether the City correctly concluded that Bonamo refused to submit to a lawful, random drug and alcohol test, and if not, the appropriate remedy. The Union cannot claim post hoc that there was any question by either party going into the arbitration whether Bonamo could be terminated under the DOT’s zero tolerance policy if *708 arbitrator Roth concluded, that he had refused to submit to the drug and alcohol test. The Union admitted as much when it requested that arbitrator Roth “hold this decision in abeyance pending its challenge to implementation of the Zero Tolerance Drug Policy.” Even arbitrator Roth admitted as much when he noted, after concluding Bonamo refused to submit to a random drug test, that “under the DOT’s recent zero tolerance drug policy the DOT normally would have the right to terminate an employee.” As the City correctly argues, this case is a CPLR article 75 motion, not an unfair labor practice grievance.
Once arbitrator Roth found that Bonamo refused to submit to a lawful, random drug and alcohol test, he exceeded his authority when he addressed the remedy and ordered the City to reinstate Bonamo to a safety-sensitive position. Therefore, the award impermissibly reflects arbitrator Roth’s “own brand of industrial justice” and on that ground alone must be vacated. (Misco, Inc., 484 US at 36, quoting Enterprise Wheel & Car Corp., 363 US at 597.)
Even assuming, arguendo, that arbitrator Roth acted within the scope of his authority, this court must then decide “whether a contractual reinstatement requirement would fall within the legal exception that makes unenforceable ‘a collective-bargaining agreement that is contrary to public policy.’ ” (Eastern Associated Coal Corp. v Mine Workers, 531 US 57, 62 [2000], quoting W.R. Grace & Co. v Rubber Workers, 461 US 757, 766 [1983].)
It is well within a court’s power to vacate an arbitration award where it “violates a strong public policy” (New York State Correctional Officers & Police Benevolent Assn., 94 NY2d at 326), provided the vacatur is “ascertained ‘by reference to the laws and legal precedents and not from general considerations of supposed public interests.’ ” (Misco, Inc., 484 US at 43, quoting W.R. Grace & Co., 461 US at 766, quoting Muschany v United States, 324 US 49, 66 [1945].) The New York Court of Appeals explicitly permits vacatur “where strong and well-defined policy considerations embodied in constitutional, statutory or common law prohibit a particular matter from being decided or certain relief from being granted by an arbitrator.” (New York State Correctional Officers & Police Benevolent Assn., 94 NY2d at 327.) These public policy considerations must be
“embodied in statute or decisional law [and] prohibit, in an absolute sense, particular matters being decided or certain relief being granted by an arbitrator. Stated another way, the courts must be able to *709 examine ... an award on its face without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement.” (Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO, 99 NY2d 1, 7 [2002], quoting Matter of Sprinzen [Nomberg], 46 NY2d 623, 631 [1979].)
The public policy issue at stake here is who sets the safety policies for public employers generally, and DOT’s ferry service in particular. This policy is embodied in the New York City Collective Bargaining Law, which lists some of the executive powers that may not be encroached upon in the collective bargaining process:
“It is the right of the city, or any other public employer, acting through its agencies, to . . . take disciplinary action [and] relieve its employees from duty because of lack of work or for other legitimate reasons . . . Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining.” (Admininistrative Code of City of NY § 12-307 [b].)
In the wake of the Staten Island Ferry disaster, DOT determined that public safety required a zero tolerance policy for ferry service employees with safety-sensitive titles. Indeed, there can be no more “legitimate reason” to “relieve its employees from duty” than evidence that those employees are abusing drugs or alcohol. The arbitrator was not charged with determining the merit of that policy; he was, in fact, prohibited by law from making any such determination. Once he decided that Bonamo had refused to submit to the test, the arbitrator had no discretion with regard to the termination of Bonamo from his safety-sensitive position.
Contrary to petitioner’s assertions, courts have not been reticent in appropriate cases to find violations of public policy warranting vacatur of an arbitrator’s award, particularly when that award would divest a governmental entity of essential powers, discretionary powers, or powers specifically conferred upon it by law. It is beyond cavil that the City’s obligation to protect its citizens from danger comes within this definition. (See, e.g., Matter of City of New York v Uniformed Fire Officers Assn., Local 854, IAFF, AFL-CIO, 95 NY2d 273 [2000], affg 263 AD2d 3 [1st Dept 1999]; see also Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York, 94 NY2d 321 [1999].)
*710 Petitioner incorrectly relies on Matter of Dowleyne v New York City Tr. Auth. (309 AD2d 583 [1st Dept 2003], revd 3 NY3d 633 [2004]). In that case, the Court of Appeals reversed the Appellate Division’s vacatur of an arbitration award ordering reinstatement, because it “improperly substituted its factual finding for that of a majority of the arbitration panel.” (3 NY3d at 634.) However, this court does not in any way disturb the factual findings of arbitrator Roth. Indeed, this decision to vacate is wholly based on the arbitrator’s factual conclusion that Bonamo refused to submit to the drug and alcohol test. This court does reject, however, the decision insofar as it reinstates Bonamo to a safety-sensitive position in the face of this factual finding.
Petitioner’s reliance on Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO (99 NY2d 1, 10 [2002]) is similarly misplaced. Indeed, petitioner reads the Court of Appeals decision as writing the public policy exception to the enforcement of arbitration awards out of existence. This court does not read that case as establishing an altar to the sacred cow of arbitration. That case defined a narrow exception, but here, in the case at bar, we have a public policy consideration “embodied in statute . . . [that] prohibit[s], in an absolute sense, . . . [the] relief being granted by [arbitrator Roth]” (Matter of New York City Tr. Auth. v Transport Workers Union of Am., Local 100, AFL-CIO, 99 NY2d 1, 7 [2002], quoting Matter of Sprinzen, 46 NY2d at 631), i.e., the New York City Collective Bargaining Law, and therefore this court is “able to examine . . . [the] award on its face without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement.” (Id.)
Petitioner also grossly mischaracterizes Eastern Associated Coal Corp. v Mine Workers (531 US 57 [2000]) as standing for the proposition that no public policy can require vacatur of an arbitration award reinstating safety-sensitive employees who test positive for drugs. In that case, the Supreme Court held that it would not vacate an arbitration award reinstating an employee to a safety-sensitive position who tested positive for drugs merely on the basis that such an award violated public policy generally. Rather, it requires courts to base vacatur on policies that can be “ascertained ‘by reference to the laws and legal precedents.’ ” (Id. at 62.) Indeed, the public policy in this case is embodied by a statutory prohibition against an arbitrator’s nullification of a regulatory agency’s power to relieve its employees from duty for legitimate reasons.
The subject of judicial review of labor arbitration awards has amassed a significant body of law in both state and federal *711 courts. The emphasis in all of these decisions is to urge judicial restraint and for the most part give deference to the determination of the arbitrator. The wisdom of this policy has proven itself over time. Nonetheless, as with any issue, courts may not abandon fundamental logic and common sense in order to reach a conclusion consistent with precedent. Even the doctrine of stare decisis is not immutable.
In this case, even if, after reviewing the considerable authorities cited by the parties, this court were to find support for the petitioner’s legal argument, the card that trumps all others is that no court may be a party to knowingly and unnecessarily placing the lives of citizens in grave danger. Given the tragedy of October 15, 2003, this court cannot give its imprimatur to an arbitrator’s decision to reinstate an employee who has been found by an arbitrator to have refused a drug and alcohol test to a safety-sensitive position. To do so would be an act of judicial irresponsibility from which I will abstain. Consider the logical consequences of such a legal position should petitioner’s argument prevail. Mr. Smith, the pilot of the Andrew J. Barberi, could grieve his termination, and upon Smith’s release from prison, an. arbitrator could reinstate him to his position, and the City and this court would be powerless to prevent his return to the ferry’s helm. Could anyone argue that such a result would be utterly irrational, contrary to public policy and devoid of even a modicum of common sense? Merely to state the proposition is to refute it. Yet, this is petitioner’s position.
While the full reinstatement in this case demands vacatur, there are other available remedies which would not have implicated public policy, e.g., reinstatement to a non-safety-sensitive position or some form of damages. Simply put, what the arbitrator cannot do and what this court cannot permit is a result that jeopardizes public safety, particularly in a case where we are not dealing with the hypothetical or theoretical, but are living with the horrible reality of October 15, 2003.
In addition to the public safety issue, this case presents an interesting issue as to the potential civil liability of the City, were Bonamo to be reinstated. Should Bonamo be found in the future to have negligently caused injury to 1 or more of the 70,000 daily passengers on the Staten Island Ferry, could the City be held responsible, even though it has done everything in its power to terminate Bonamo from this posi *712 tion? While this court need not reach such a question, it does serve to illustrate the absurd result of deference to this arbitration award.
For the reasons stated herein, the motion to confirm the arbitration award is denied and the cross motion to vacate is granted, insofar as the award orders reinstatement of Bonamo as a deckhand.