ACTION ELECTRIC, INC., Appellant,

v.

LOCAL UNION NO. 292, INTERNA-
TIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, Appellee.

No. 87–5338.

United States Court of Appeals,
Eighth Circuit.

Submitted May 11, 1988.

Decided Sept. 7, 1988.

See also, 8th Cir., 818 F.2d 15.

Mary Jane Gooch, Lincoln, Neb., for appellant.

Stephen D. Gordon, Minneapolis, Minn., for appellee.

Before JOHN R. GIBSON, Circuit Judge, PECK * and HENLEY, Senior Circuit Judges.

JOHN W. PECK, Senior Circuit Judge.

This is an appeal from a district court's summary judgment order holding that appellant Action Electric, Inc., did not effectively withdraw from a multi-employer bargaining unit and therefore continued to be bound by the unit's collective bargaining agreement with appellee Local No. 292, International Brotherhood of Electrical Workers ("Local 292"). For the reasons stated herein, we reverse the district court's judgment.

On October 8, 1980, Action, an electrical contractor, signed a Letter of Assent–A which authorized the National Electrical Contractors Association ("NECA") to act as Action's bargaining representative in negotiations with Local 292. Under this arrangement Action became bound by a collective bargaining agreement between Local 292 and NECA which was effective May 1, 1982, through April 30, 1984, and year to year thereafter unless changed or terminated as permitted under the agreement. Under the terms of the Letter of Assent–A Action could terminate its autho-

_____

* The HONORABLE JOHN W. PECK, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

rization of NECA to act as its collective bargaining representative:

"This authorization, in compliance with the current approved labor agreement shall become effective on the 8th day of October, 1980. It shall remain in effect until terminated by the undersigned employer giving notice to [NECA] and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the aforementioned approved labor agreement."

At the heart of this dispute is an apparent conflict created by this withdrawal provision of the Letter of Assent–A and certain provisions of the collective bargaining agreement between NECA and Local 292. Under Art. 1, § 1.02(a) of the collective bargaining agreement "[e]ither party desiring to change or terminate this Agreement must notify the other in writing at least ninety (90) days prior to the anniversary date." However, under Art. 1, § 1.03 "[t]his Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto." The Letter of Assent–A is silent on the effect of early or mid-contract term negotiations on the employer's ability or right to exercise the 150–day withdrawal notice provision.

Pursuant to the withdrawal provision in Letter of Assent–A and 158 days prior to the anniversary date of the labor agreement then in effect, Action notified both NECA and Local 292 by certified letters on November 25, 1983, that it was terminating its authorization. In the meantime, however, unfavorable conditions in the industry apparently prompted NECA to seek early negotiations to extend the 1982–84 collective bargaining agreement and thereby stabilize labor relations. Local 292 agreed to such, and NECA published notice in an "Industry Alert" bulletin dated November 3, 1983, that "[n]egotiations with I.B.E.W. Local 292 will commence no sooner than November 7, 1983...." Although NECA has averred that this "Industry Alert" was mailed to Action, Action has steadfastly denied that it ever received it. On November 7, 1983, NECA and Local 292 began negotiations. They reached an extension to the original contract covering the period May 1, 1984, through April 30, 1985.

In April 1984 Action, having never received any response to its notice of withdrawal, notified Local 292 by letter of its willingness to negotiate with Local 292 as an individual employer. On May 3, 1984, Local 292 replied that Action's notice of withdrawal from the multi-employer bargaining unit was untimely, because contract negotiations between NECA and Local 292 had already begun, when the notice was given.

On October 2, 1984, Local 292 filed a grievance against Action alleging that Action had violated the collective bargaining agreement by operating a "double-breasted" shop, i.e. Action had diverted work contractually reserved for union members to a non-union shop it owned. In November 1984 the Labor–Management Committee, provided for under the collective bargaining agreement, convened to hear the grievance. Action alleged that the Labor–Management Committee lacked jurisdiction over the grievance on the basis that Action had withdrawn from the multi-employer bargaining unit and was therefore not a party to the 1984–85 agreement. Without addressing Action's jurisdictional challenge, the Labor–Management Committee issued a decision finding that Action had violated the collective bargaining agreement. Action was ordered to cease and desist from double-breasting, and to compensate local members for wages and fringe benefits lost due to the diversion of work.

On March 8, 1985, Action filed an action in the Hennepin County (Minnesota) District Court to vacate the Committee's award. Local 292 removed the action, styled as a Motion to Enforce the Arbitration Award and for Attorney's Fees, to federal district court and moved for summary judgment.

On September 10, 1985, the district court granted the motion and confirmed the arbitration award. Although the district court found that Action's notice of termination complied with the 150–day period specified by the Letter of Assent–A, it agreed with

Local 292's argument that as a matter of law Action's otherwise timely notice was ineffective because it was given after contract negotiations had already begun.[1] The district court reasoned as follows:

The courts have consistently noted that multi-employer bargaining serves an important function in promoting labor peace through strengthened labor bargaining. These multi-employer bargaining units are viable only if stable. Accordingly, the courts have adopted a strict rule which governs the rights of the parties to terminate the multi-employer bargaining arrangement. The goal of the strict rule is to remove the threat of withdrawal as a bargaining tool. *See N.L.R.B. v. L.B. Priester and Son, Inc.*, 669 F.2d 355, 360 (5th Cir. 1982). Once negotiations have begun on a contract, the employer may not withdraw absent consent of the union or "unusual circumstances". *Charles D. Bonanno Linen Service v. N.L.R.B.*, 454 U.S. 409 [404], 410–11 [102 S.Ct. 720, 724–25, 70 L.Ed.2d 656] (1982); *N.L.R.B. v. Custom Wood Specialities, Inc.*, 622 F.2d 381, 384 (8th Cir.1980).

The district court rejected Action's argument that the commencement of early negotiations, allegedly without adequate notice to Action, constituted "unusual circumstances." The district court distinguished *Acropolis Painting and Decorating*, 272 NLRB 150 (1984), in which the NLRB held that the employer could withdraw from the multi-employer unit even though negotiations had already begun; the district court interpreted certain contract provision in *Acropolis Painting* as allowing withdrawal not only from the agreement, but also during negotiations. The district court thus concluded that Action was bound by the collective bargaining agreement which extended through April 30, 1985.

Action timely appeals from the final judgment of the district court[2] dated June 30, 1987. That judgment confirmed the arbitration award, ordered Action's compliance with that award, and awarded Local 292 $191,769.94, the amount of diverted wages and benefits as determined by the Labor–Management Committee. The sole issue on appeal is whether the district court properly concluded that Action's attempted withdrawal from the multi-employer bargaining unit was invalid.

Multi-employer bargaining, common in numerous industries, has long been a useful tool in effectuating the collective bargaining process and promoting labor peace. Nonetheless, multi-employer bargaining has presented the National Labor Relations Board ("the Board") and the courts with various problems, one being the right of an employer to withdraw from the multi-employer bargaining unit and terminate the arrangement. Originally, employers and the union were permitted to withdraw from the multi-employer bargaining unit even during bargaining. *Charles D. Bonnano Linen Service, Inc. v. NLRB*, 454 U.S. 404, 410, 102 S.Ct. 720, 724, 70 L.Ed.2d 656 (1982). However, in *Retail Associates, Inc.*, 120 NLRB 388 (1958), the Board established standards circumscribing the timing of withdrawal from a multi-employer unit. The Board stated:

We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations. Where actual bargaining negotiations based on the existing multiemployer unit have begun, we would not permit, except on mutual consent, an abandonment of the unit upon

---

1. Although a court, of course, may not review the merits of an arbitration award, *Zeviar v. Local 2747, Airline, Aerospace and Allied Employees*, 733 F.2d 556, 559 (8th Cir.1984), judicial resolution is proper where the issue, as here, concerns the existence of a contract and whether the parties have agreed to arbitrate, *United Steelworkers of America v. Warrior & Gulf Navi-*

gation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960).

2. Action twice previously attempted to appeal, but those appeals were dismissed due to procedural difficulties which have since been rectified and have no bearing on this appeal.

which each side has committed itself to the other, absent unusual circumstances. *Id.* at 395. The *Retail Associates* rule attempts to reconcile and balance two key legitimate interests underlying multi-employer bargaining: the voluntary nature of the association and the need for stability of the multi-employer unit. *Id.* at 393. As noted by the Supreme Court, "[t]he Board has recognized the voluntary nature of multi-employer bargaining. It neither forces employers into multi-employer units nor erects barriers to withdrawal prior to bargaining. At the same time, it has sought to further the utility of multi-employer bargaining as an instrument of labor peace by limiting the circumstances under which any party may unilaterally withdraw during negotiations." *Bonnano,* 454 U.S. at 412, 102 S.Ct. at 725.

■ The case on appeal vividly illustrates the tension that can be created by the legitimate, but sometimes conflicting, interests of voluntary association and bargaining unit stability. As a result this case is not susceptible to easy resolution and indeed presents this panel with significant difficulties. On the one hand, as Action argues and as the district court has found, Action complied with the literal terms of the withdrawal requirements in Letter of Assent–A. Action did all that was contractually required of it under the terms of the authorization. Action submits that "[n]o more is necessary to operate safely in its [*Retail Associate*'s] domain … than advertence to the notice dates in the current bargaining agreement," *Carvel Co. v. NLRB,* 560 F.2d 1030, 1035 (1st Cir.1977), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 766 (1978), and that "the unannounced premature commencement of actual negotiations could not foreclose the [employer] from withdrawing in accord with the agreed-upon procedure …," *Acropolis,* 272 NLRB at 150. On the other hand, as the Local argues and as the district court has concluded, *Retail Associates* appears to mandate that, once negotiations "have commenced" or "actually begin," withdrawal is permitted only by mutual consent or unusual circumstances. *Bonnano,* 454 U.S. at 411, 102 S.Ct. at 724; *accord,*

*NLRB v. Callier,* 630 F.2d 595, 596–97 (8th Cir.1980).

Our review of relevant case law indicates that there is support for both sides of the argument. On balance, however, recent Board cases strongly suggest to us that under certain circumstances prior notification of the date set for bargaining may be implicit in the employer's obligation and ability to withdraw from the unit prior "to the agreed upon date to begin the multi-employer negotiations." *Retail Associates,* 120 NLRB at 395. In *Acropolis* the Board unequivocally stated that "unannounced premature" negotiations could not prevent the employer from withdrawing from the unit consistent with the "agreed-upon procedure" in the agreement. 272 NLRB at 150. Local 292 has attempted to distinguish *Acropolis* and its seemingly dispositive holding on several grounds and, indeed, persuaded the district court that *Acropolis* should be distinguished from the case on appeal. Specifically, Local 292 and the district court read the withdrawal provisions in *Acropolis* as contemplating and permitting the withdrawal of an employer during negotiations, which renders *Acropolis* inapposite to the instant case. We have carefully studied the contract provisions in *Acropolis* and have concluded that the district court's construction of those provisions is misplaced. Although a possible effect of the provisions, as drafted and perhaps unintended by the parties, is withdrawal during negotiations, we believe the district court and the Local overlooked the more obvious reason for the provisions.

Article 25 of the contract in *Acropolis* provided in relevant part:

Section 1. During the month of January of the year of expiration of this Agreement or during the month of January of the expiration year of any subsequent Agreement, any party signatory thereto may give written notice to the Administration Office that said party wishes to withdraw from this Agreement. Should such notice be given such party shall no longer be bound to this Agreement as of July 1 of the year this Agreement expires, or as of a subse-

quent July 1 of the expiration year of any subsequent Agreement. The Agreement shall continue as to all parties not giving such notice. Further, said notice of withdrawal eliminates said party from participation in any negotiations regarding this Agreement.... The notice herein provided for is the sole means by which a party may withdraw from or cancel this Agreement.

Section 2. This Agreement shall be in full force and effect for a period of three (3) years from July 1, 1980 through June 30, 1983, and remain in full force and effect from year to year thereafter, unless either party hereto shall give notice to the other party, in writing, of their desire to change or revise this Agreement. Such written notice shall be presented to the other party not less than one hundred twenty (120) days prior to the renewal date stipulated.

*Id.* at 151. Historically, under these provisions, the union and the multi-employer bargaining representative conducted bargaining in the spring of the year in which the contract was scheduled to terminate. *Id.*

It seems clear that the Section 1's provision eliminating a withdrawing employer from participation in any negotiations is merely an expression of the fact and concern that an employer's notice of withdrawal in January was not effective until the following July 1, the collective bargaining agreement's expiration date and a point in time after which springtime negotiations for the successive contract ordinarily would have been conducted. In other words, the provision clarifies that an employer who states its intent in January to withdraw effective in July, and who is therefore otherwise still a bargaining unit member until July, should not be permitted to participate in unit negotiations for a future contract to which it would not be a party. Indeed, the significance of the provision to the ALJ, whose reasoning and opinion was adopted by a three-member panel of the Board, was that "by virtue of this provision the Association and Union agreed that an employer would no longer be a part of the Association-wide multi-employer bargaining unit

for purposes of the negotiations for a successor contract ... if the employer in January 1983 submitted a written notice...." The ALJ also stressed that "to hold otherwise would not effectuate the policies of the Act because the Union and Association by their conduct of including Article 25 ... consented to the Respondents' January 1983 withdrawals and led them to believe they could withdraw from the unit at that time...." *Id.* at 156.

There are some factual differences between *Acropolis* and the case on appeal, but we conclude that those differences are not sufficient to render *Acropolis* inapposite. Rather, we believe that the pivotal factors of unannounced, premature negotiations and the employer's compliance with an agreed-upon withdrawal procedure in *Acropolis* speak forcefully for reversal in this case. Our conclusion is buttressed by two other recent Board cases which hinge on these factors.

In *Jasper Enterprises, Inc.*, 287 NLRB No. 77, 127 LRRM (BNA) 1192 (Dec. 16, 1987), the Board reversed an administrative law judge's determination that a respondent employer's attempted withdrawal was untimely under *Retail Associates* principles because negotiations had already begun. The Board asserted that the ALJ failed to "take into account several critical factors that render inapt her application of the untimeliness rule to [respondent's] withdrawal." One factor was the party's bargaining history; there was a lack of continuity in both the respondent's and bargaining representative's participation in the multi-employer unit and a lengthy dormant period in the bargaining representative's activity on behalf of the respondent and others. 127 LRRM at 1193. The other key factor was "the lack of prior notice" of impending negotiations to the respondent. *Id.* at 1194. Although a complex bargaining history, not a factor in the case on appeal, certainly played a significant role in the Board's resolution of *Jasper Enterprises*, the lack of prior notice also heavily weighed in the Board's analysis as reflected by its declaration in a footnote that "[n]otification of the date set for bargain-

ing is a prerequisite to 'timely' withdrawal." *Id.* at 1194 n. 4.

The necessity of prior notice of bargaining was also suggested in *Electrical Workers Local Union 952*, 275 NLRB 319 (1985). In discussing an employer's right of withdrawal under provisions similar to the case on appeal, the Board repeatedly emphasized facts that "[t]he Employer received no notification of the bargaining before it took place, while it occurred, or at any time prior to execution of [the] Agreement...."[3] *Id.* at 320. The employer's adherence to an agreed-upon provision for withdrawal also vitally affected the outcome in *Local 952.* In *Local 952* the Board held that the employer effectively terminated its authorization and that "[i]n reaching this conclusion we specifically rely on the literal terms set forth in the Letter of Assent under which the Employer's notice was timely." *Id.* at 321.

Overall, these recent Board cases reflect the Board's efforts to strike a balance recognizing the dual underpinnings of multi-employer bargaining—voluntary association and unit stability. The cases also mark the evolution of the "ground rules for multi-employer bargaining," the Board's judgments in this area of its expertise being entitled to deference. *Bonnano*, 454 U.S. at 413, 102 S.Ct. at 725. We believe that the Board's decisions in *Acropolis, Jasper Enterprises* and *Local 952* indicate that adequate notice of impending bargaining is implicit in the employer's right to withdraw consistent with agreed upon withdrawal provisions prior "to the agreed-upon date to begin multi-employer negotiations." Absent such notice there is no true consent by the employer to be part of the multi-employer bargaining process. Rather, the unannounced, premature commencement of negotiations could "sandbag" an employer, who has timely attempted to withdraw from the unit pursuant to agreed-upon means, into continued and unwilling participation in the unit for a significant period of time. This result would run

contrary to the principle that "multi-employer bargaining rests on the reality of the consent of the union and of each employer...." *Carvel*, 560 F.2d at 1035; *accord Bonnano*, 454 U.S. at 412, 102 S.Ct. at 725; *International Brotherhood of Electrical Workers, Local Union No. 194*, 285 NLRB No. 58, slip. op. at 7 (August 18, 1987).

At the same time, recent Board cases also indicate that a case-by-case approach taking into account all relevant circumstances is necessary and appropriate to the resolution of disputes in this area and to balance the legitimate interests of stability and voluntariness. For example, the Board, as noted above, considered important the unusual bargaining history of the parties in *Jasper Enterprises.* 127 LRRM at 1193. The Board has also looked to any conduct of the employer that would lead the Union to believe that the employer intended to be bound by further agreements. *Local 952*, 275 NLRB at 321. Moreover, the Board has considered the express language of the provisions by which the parties have agreed to be bound and by which they may withdraw. *Id.* at 321. The Board has followed the fundamental rule that doubtful language must be construed most strongly against the party who drafted that language, *Local 194*, slip op. at 8 (construing the same IBEW/NECA Letter of Assent–A as in the case on appeal); *accord Local 952*, 275 NLRB at 321, and who, by consenting to the withdrawal provision as written, has led the employer to believe it could withdraw pursuant to the clear terms of that provision, *Acropolis*, 272 NLRB at 157.

Therefore, we disagree with the district court's view of *Retail Associates* and its progeny. As the district court recognized, stability is a critical factor in multi-employer bargaining and is a primary goal to be served by the *Retail Associates* principles governing withdrawal. However, we do not perceive the Board's recent decisions as

---

**3.** We are aware that in Local 952 the employer's first attempted withdrawal prior to any negotiations was deemed effective. Nonetheless, the Board's lengthy discussion of the employer's second attempted withdrawal during unannounced negotiations and the principles surrounding withdrawal is highly relevant to the case on appeal.

adopting the hard and fast position suggested by the district court that in cases involving lack of notice of premature negotiations an employer can never withdraw from the unit pursuant to the clear terms of its Letter of Assent once bargaining has commenced. Such an approach wholly ignores the voluntariness element of multi-employer bargaining.

Thus, we must remand this case to the district court for further development of the contested factual issues, left unresolved by the summary judgment order. These factual issues include the alleged lack of notice to Action regarding the impending, premature negotiations and alleged conduct by Action after its attempted withdrawal that rendered equivocal its expressed intent to withdrawal. The judgment of the district court is hereby reversed, and the case is remanded for further proceedings consistent with this opinion.