**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SOUTHWEST REGIONAL
COUNCIL OF CARPENTERS,
*Plaintiff-Appellant*,

v.

DRYWALL DYNAMICS, INC.,
*Defendant-Appellee.*

No. 14-55250

D.C. No.
2:13-cv-05350-JAK-SP

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted February 12, 2016
Pasadena, California

Filed May 19, 2016

Before: Marsha S. Berzon and John B. Owens, Circuit
Judges, and Algenon L. Marbley,[*] District Judge.

Opinion by Judge Berzon

---

[*] The Honorable Algenon L. Marbley, District Judge for the U.S. District Court for the Southern District of Ohio, sitting by designation.

## SUMMARY[**]

### Arbitration / Labor Law

The panel reversed the district court's order vacating an arbitration award in a labor law case.

The arbitrator ruled that an employer was bound by a memorandum of understanding extending the term of a labor agreement. The district court vacated the arbitration award on the grounds that the arbitrator's interpretation of the parties' agreement was not plausible and was contrary to public policy.

The panel held that the district court's decision exceeded its narrow authority to determine whether the arbitrator's award was based on the parties' contract and whether it violated an explicit, well-defined, and dominant public policy.

## COUNSEL

Melissa R. Shimizu (argued) and Daniel M. Shanley, DeCarlo & Shanley, Los Angeles, California, for Plaintiff-Appellant.

Rick J. Sutherland (argued), Jackson Lewis, Salt Lake City, Utah, for Respondent-Appellee.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

BERZON, Circuit Judge:

This case requires us once more to clarify the limited role played by courts in reviewing labor arbitration awards. Respondent Drywall Dynamics, Inc. ("Drywall") entered into a labor agreement with petitioner Southwest Regional Council of Carpenters ("SWRCC" or "the Union") according to which Drywall assigned to a contractors' association authority to bargain on its behalf. Some years later, having grown dissatisfied with this arrangement, Drywall attempted to terminate the agreement at what it thought was the appropriate time, only to discover that the Union and the association had executed a Memorandum of Understanding extending the term of the agreement.

An arbitrator held that Drywall was bound by the Memorandum. But the district court vacated the arbitration award, holding that the arbitrator's interpretation of the parties' agreement was not "plausible" and was, moreover, contrary to public policy. We conclude that the district court's decision exceeded its narrow authority to determine whether the arbitrator's award was based on the parties' contract and whether it violated an "explicit, well-defined, and dominant public policy," *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 63 (2000), and accordingly reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

Drywall is a Utah-based construction company; SWRCC represents workers in the construction industry. On July 15, 2005, Drywall and SWRCC entered into a Memorandum

Agreement according to which Drywall agreed to be bound by a Master Labor Agreement ("MLA") between the Union and the Drywall/Lathing Conference of the Western Wall & Ceiling Contractors Association ("WWCCA" or "the Association"), as well as "any extensions, renewals or subsequent Master Agreements." Drywall waived "any right that . . . it may have to terminate, abrogate, repudiate or cancel this Agreement during its term or during the term of any future modifications, changes, amendments, supplements, extensions, or renewals of or to said Master Agreement." The Memorandum Agreement further provided that Drywall "authorize[d] the Association to represent" it unless Drywall gave notice of its desire to withdraw from the agreement "at least sixty (60) days, but no earlier than ninety (90) days prior to the termination date" of the then-effective MLA. The MLA in place when the parties executed the Memorandum Agreement was due to expire on June 30, 2006, but provided that it would "continue to remain in full force and effect from year to year thereafter without change or modification" unless either party proposed such changes within 60 to 90 days of the termination date.

On April 30, 2008, Drywall notified the Union "of its intent to no longer be bound" by the MLA as of June 30, 2008. In fact, the Union and the Association had already negotiated a successor five-year MLA, which would expire on June 30, 2010. In response to Drywall's notice, the Union informed the company that its purported termination was untimely, although the Union erroneously asserted that the Agreement's new end date was September 30, 2009. Drywall opted not to dispute this point and continued complying with the MLA.

On April 15, 2009, Drywall again gave the Union notice of its intent to terminate the Agreement, this time as of June 30, 2009.  On May 6, the Union informed Drywall that its proffered termination was untimely, asserting that the Agreement remained in effect until June 30, 2010, as provided by the successor MLA.

In fact, before sending this communication, the Union had, on April 16, 2009, executed a Memorandum of Understanding ("MOU") with the Association.  The MOU provided for an extension of the MLA until June 30, 2011, in exchange for the Union's agreement to defer a portion of a negotiated pay raise.  The MOU further provided that "only WWCCA Drywall/Lathing Conference Members who affirmatively agree to this Agreement will be bound to it" and so permitted to pay the lower rate.  Those members who did not affirmatively agree to the MOU were to "pay the full . . . increase previously agreed upon."

On April 13, 2010, Drywall attempted again to terminate its agreement with the Union and the WWCCA, effective June 30, 2010.  The Union once more responded that the termination was untimely, explaining—as was the case—that the agreement had been extended until June 30, 2011.

On July 6, 2010, the Union filed a grievance against Drywall with the Southern California Drywall Joint Adjustment Board ("Adjustment Board" or "Board"), alleging six specific contractual violations.[1]  The grievance

---

[1] The Union alleged that Drywall (1) "failed to have employees referred to jobs through the hiring hall"; (2) "failed to secure a bond"; (3) "failed to register jobs"; (4) "failed to pay wages and benefits per agreement"; (5) "paid apprentice wages and benefits to individuals who were not

came before an Adjustment Board arbitration panel for hearing in August and September 2011. During the first day of the hearing, on August 9, the Union asked the Board to resolve, in addition to the six violations named in the initial grievance, the question whether Drywall's purported termination of its agreement with the Union was effective. Drywall objected, arguing that whether it had effectively terminated its contract in 2010 was not relevant to any of the grievances filed by SWRCC. Relying on a provision of the MLA requiring grievances to be brought "within thirty (30) days after the complaining party has actual knowledge of the facts giving rise to the dispute," Drywall moved to dismiss the termination issue "based on . . . timeliness" and argued that the Union's contention was "procedurally barred." In response, the Adjustment Board issued an "Interim Award" in which it indicated that it would decide the validity of Drywall's termination "because the issue is related to the overall grievance," but held that issue in abeyance "pending . . . further review of the evidence."

Later, the Board issued "Interim Award II," in which it unanimously ruled that Drywall's purported termination of the MLA in 2010 was untimely because the 2009 MOU had extended the Agreement until 2011. In support of that conclusion, the Board noted that the Union and the Association had each given consideration for the modification of the Agreement, and that Drywall was "bound by the negotiations and the agreements of those parties." The parties resolved the remaining grievance issues outside of arbitration. Accordingly, on July 22, 2013, the Board issued its "Final

properly indentured apprentices"; and (6) "failed to provide Union with requested information necessary to ensure contract compliance."

Award," which restated its previous findings and confirmed that there were no remaining issues.

The Union filed a petition in the district court seeking to confirm the arbitration award. After Drywall filed a petition to vacate the award, the district court issued an order denying the Union's petition and granting Drywall's.

In so ruling, the district court acknowledged that arbitration awards are "entitled to substantial deference from the district court," but nonetheless held the award unenforceable, on two bases. First, the court ruled that the arbitration panel's interpretation of the contracts was not "plausible." The 2009 MOU provided that it would apply only to those members of the Association who affirmatively agreed to it, but "[n]o evidence was presented to the Panel that Drywall" did so, "nor did the Panel make a finding of fact that Drywall consented to the extension of the 2006–2010 MLA." Absent such a finding, the court concluded, "it was not plausible for the Panel to find that the extension of the MLA was binding on Drywall." Second, relying on the Supreme Court's decision in *Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404 (1982), the court held that the arbitration award violated "a clear public policy in favor of voluntary relationships among employers and multi-employer bargaining units" because "[a]s interpreted by the Panel, the agreements gave WWCCA absolute authority to negotiate on Drywall's behalf and perpetually bind it to extensions of the MLA without further consent by Drywall."

This appeal followed.

## DISCUSSION

Beginning with the Supreme Court's *Steelworkers Trilogy*, the unique and critical role played by arbitration in the context of a collective bargaining agreement has been a bedrock of national labor policy. *See United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960). As *Warrior & Gulf* explained, "the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government." 363 U.S. at 581. Indeed, arbitration in the labor context is more than a mechanism for resolving disputes. Instead, the "processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." *Id.*

Because of the centrality of the arbitration process to stable collective bargaining relationships, courts reviewing labor arbitration awards afford a "nearly unparalleled degree of deference" to the arbitrator's decision. *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers*, 886 F.2d 1200, 1204–05 (9th Cir. 1989) (en banc). This deference applies both to the arbitrator's interpretation of the parties' agreement and to his findings of fact. *Id.* at 1207.

With regard to contractual interpretation, as the Supreme Court has admonished, "the parties hav[e] authorized the arbitrator to give meaning to the language of the agreement, [so] a court should not reject an award on the ground that the arbitrator misread the contract." *United Paperworkers Int'l*

*Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). We have taken this instruction to heart, explaining that "even if we were convinced that the arbitrator misread the contract or erred in interpreting it, such a conviction would not be a permissible ground for vacating the award." *Va. Mason Hosp. v. Wash. State Nurses Ass'n*, 511 F.3d 908, 913–14 (9th Cir. 2007) (footnote omitted). Indeed, "[s]ince the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot 'misinterpret' a collective bargaining agreement." *Stead Motors*, 886 F.2d at 1205. In this sense, "his award *is* their contract." *Id.* (quoting Theodore J. St. Antoine, *Judicial Review of Labor Arbitration Awards*, 75 Mich. L. Rev. 1137, 1140 (1977)). Thus, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," his award must be upheld. *Misco*, 484 U.S. at 38. A court may intervene only when an arbitrator's award fails to "draw[] its essence from the collective bargaining agreement," such that the arbitrator is merely "dispens[ing] his own brand of industrial justice." *Enterprise Wheel*, 363 U.S. at 597.

Similarly, "[t]he parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them." *Misco*, 484 U.S. at 45. "[I]mprovident, even silly, factfinding . . . is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts." *Id.* at 39. Because of this precept, "a court is barred from disregarding the arbitrator's factual determinations, let alone supplementing them with its own." *Stead Motors*, 886 F.2d at 1207.

To be sure, there are limited circumstances in which the vacatur of a labor arbitration award is justified. We have recognized four such circumstances:

> (1) when the award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing his own brand of industrial justice; (2) where the arbitrator exceeds the boundaries of the issues submitted to him; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud.

*S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 792–93 (9th Cir. 2001). The district court concluded that the first and third of these circumstances obtain in the present case. Drywall further urges that the arbitrator's decision "excced[ed] the boundaries of the issues submitted to him." We discuss each proffered basis for vacatur in turn.

## I.  The Scope of the Grievance

We address as an initial matter whether the Adjustment Board's decision to consider the termination issue, even though it was not one of the issues initially articulated, provides grounds to vacate the Board's determination on that issue. We agree with the district court that it does not.

Once a matter is submitted to arbitration, "'procedural questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964). "So, too, the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'" *Id.*

(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

In this case, in response to the Union's request on the first day of arbitration hearings that the Board decide whether Drywall's contract with the union was still in existence or had terminated, Drywall moved to dismiss the termination issue "based on . . . timeliness" and argued that the Union's contention was "procedurally barred." The Board, in its first Interim Award, noted Drywall's objection but ruled that the termination issue "will be decided by the panel because the issue is related to the overall grievance and because the contractor presented evidence and argument on this issue." The Board's rejection of Drywall's timeliness argument was a quintessentially procedural decision to which the district court was required to—and properly did—defer.

## II.  The District Court's "Plausibility" Ruling

The 2009 MOU between the Union and the Association provided that it would apply to "WWCCA Drywall/Lathing Conference Members who affirmatively agree to this Agreement." The district court concluded that it was "implausible" for the arbitration panel to interpret this agreement as applying to Drywall, for two reasons: first, evidence before the district court indicated that Drywall was not a member of the Association at the time of the MOU; second, no evidence was presented to the Adjustment Board indicating that Drywall affirmatively agreed to be bound by the extension.

The district court erred in two respects in making its "plausibility" ruling. Most fundamentally, the court conducted the wrong inquiry. Under controlling Supreme

Court precedent, a court may not evaluate an arbitrator's interpretation of an agreement to determine whether it meets some judicial standard of acceptability as a construction of the contract. Rather, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Enterprise Wheel*, 363 U.S. at 597). The question is not, therefore, whether the arbitrator's interpretation of the agreement was "plausible," in the sense of one a court might render, but instead whether he made any interpretation or application of the agreement at all. If so, the court's inquiry ends.

The district court's error is perhaps understandable in light of language from a long line of Ninth Circuit cases articulating *Enterprise Wheel*'s admonition that an arbitrator's decision must "draw its essence" from the agreement as requiring a "plausible interpretation of the contract." *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc. of Ariz.*, 84 F.3d 1186, 1190 (9th Cir. 1996); *see also, e.g.*, *Ass'n of W. Pulp & Paper Workers, Local 78 v. Rexam Graphic, Inc.*, 221 F.3d 1085, 1090 (9th Cir. 2000); *United Food & Commercial Workers Union, Local 1119, AFL-CIO v. United Markets, Inc.*, 784 F.2d 1413, 1415 (9th Cir. 1986); *Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers Int'l Union, AFL-CIO*, 412 F.2d 899, 903 (9th Cir. 1969). As we have carefully explained, however, "the 'plausibility' inquiry does not

represent an independent avenue for a merits-based attack on an arbitral award. Rather, it is nothing more than another way of formulating the old rule of *Enterprise Wheel* that an arbitrator may not 'dispense his own brand of industrial justice.'" *Haw. Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1183 (9th Cir. 2001). *Hawaii Teamsters* reiterated that the relevant inquiry is simply whether "the arbitrator's decision *concerns* construction of the contract," not an evaluation of the merits of that construction. *Id.* (quoting *Enterprise Wheel*, 363 U.S. at 599) (emphasis added in *Hawaii Teamsters*).

As a description of the appropriate standard for evaluating a labor arbitration award, the word "plausible" is thus somewhat misleading. It could suggest some inquiry into the *quality* of the arbitrator's interpretation. The likelihood of such a misunderstanding, we fear, has been exacerbated in recent years. In the wake of the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the term "plausible" has taken on additional coloration in legal parlance. *Iqbal* described the "plausibility" determination it requires at the motion-to-dismiss stage of litigation as "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense" in determining the legal sufficiency of a federal court complaint. *Id.* at 679. Such an active, substantive judicial role is in sharp contrast to the judicial "hands off" approach long required in labor arbitration cases, as long as the arbitrator engages with the interpretive task.

We conclude that it is time for us to retire the use of "plausibility" as a term to describe the courts' role in reviewing labor arbitration awards. We do not, of course, propose any substantive change to the settled law in this area,

nor could we. We merely reiterate, and emphasize, the fundamental concept *Hawaii Teamsters* articulated, drawing on decades of Supreme Court jurisprudence: the quality—that is, the degree of substantive validity—of an arbitrator's interpretation is, and always has been, beside the point. Instead, the appropriate question for a court to ask when determining whether to enforce a labor arbitration award interpreting a collective bargaining agreement is a simple binary one: Did the arbitrator look at and construe the contract, or did he not?

Here, there can be little doubt that the Adjustment Board's decision was grounded in its reading of the parties' agreements. There are three paragraphs in the Board's second Interim Award that directly address its understanding of the contract, including why it regarded Drywall as bound by the 2009 MOU extending the term of the agreement. The Board looked to the provisions of the MOU in determining that both the Union and the Association had given consideration for the agreement, and it read the Memorandum Agreement between the Union and Drywall as binding Drywall to future negotiations between the Union and the Association, unless and until Drywall timely terminated.

The Adjustment Board also interpreted the agreements in light of the past practices of the parties. Drywall had acceded to the extension of the initial MLA until June 2010, despite the fact that it had not affirmatively agreed to that extension. The Board concluded that "in light of the fact that the contractor had been bound" by those prior negotiations, it was also bound by the extension of the contract until June 2011. The Supreme Court has explained that "the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although

not expressed in it." *Warrior & Gulf*, 363 U.S. at 581–82. The Adjustment Board based its decisions on the parties' agreements, both as written and as informed by past practice. The district court should have deferred to the panel's interpretation rather than inquiring into its substantive merit.

The district court further erred when it both faulted the Adjustment Board for failing to make any finding regarding Drywall's agreement to the MOU and improperly made its own findings on that point. Courts "do not require labor arbitrators to make the sorts of explicit or exhaustive 'findings of fact' we demand of district courts; likewise, the reasons for arbitral rulings need not be spelled out in detail. Indeed, '[a]rbitrators have no obligation . . . to give their reasons for an award' at all." *Stead Motors*, 886 F.2d at 1206 (quoting *Enterprise Wheel*, 363 U.S. at 598). That the Adjustment Board made no explicit factual findings concerning Drywall's consent to the MOU was not, therefore, a proper basis for vacating the award. As long as the panel was applying the agreement, the district court could not fault it for "improvident, even silly, factfinding." *Misco*, 484 U.S. at 39. Nor may a court "infer the non-existence of a particular reason merely from the award's silence on a given issue." *Stead Motors*, 886 F.2d at 1213; *see also Aramark Facility Servs. v. Serv. Emps. Int'l Union, Local 1877, AFL CIO*, 530 F.3d 817, 830 (9th Cir. 2008) (explaining that it was "improper" for a district court to "disturb[] the arbitrator's implicit conclusion").

Finally, compounding the error, the district court explicitly made its own findings—"Drywall was not a member of the WWCAA" and "[n]o . . . consent was given" by Drywall. The law requires deference to an arbitrator's decision even where a court "believe[s] that the decision finds

the facts . . . erroneously." *Stead Motors*, 886 F.2d at 1204. Because "[t]he parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them," *Misco*, 484 U.S. at 45, the district court erred in vacating the award on this basis.

## III.     The Public Policy Exception

The labor arbitration case law has long recognized a very limited "public policy exception" to the stringent rule ordinarily requiring courts' enforcement of arbitrators' decisions interpreting and applying collective bargaining agreements. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983); *Stead Motors*, 886 F.2d at 1209–10. This exception is "a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *Misco*, 484 U.S. at 42.

"[T]he public policy exception is narrow," *E. Associated Coal*, 531 U.S. at 63, and "courts should be reluctant to vacate arbitral awards on public policy grounds," *Ariz. Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 992 (9th Cir. 1995). Specifically, a court may vacate an arbitration award that "run[s] contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests." *E. Associated Coal*, 531 U.S. at 63 (citing *Misco*, 484 U.S. at 43).[2]

---

[2] As *Eastern Associated Coal* noted, "in principle, . . . courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law." 531 U.S. at 63.

In this case, the district court determined that the arbitrator's award violated "a clear public policy in favor of voluntary relationships among employers and multi-employer bargaining units."  The court pointed to two sources for this policy: the Supreme Court's decision in *Bonanno*, 454 U.S. 404, and the Eighth Circuit's decision in *Action Electric, Inc. v. Local Union No. 292, International Brotherhood of Electrical Workers*, 856 F.2d 1062 (8th Cir. 1988).  Neither case relied upon by the district court establishes an "explicit, well-defined, and dominant public policy" sufficient to justify vacating the arbitration award here.

To be sure, each case recognizes in general terms that "the voluntary nature of multiemployer bargaining" is a significant interest that merits consideration.  But each case also emphasizes that an employer's right to withdraw from a multiemployer unit is one of two *competing* interests.  The other is "the stability of multiemployer units," which must, in each generic circumstance, be weighed against the voluntariness value.  *Bonanno*, 454 U.S. at 410; *see also Action Elec.*, 856 F.2d at 1065 (recognizing "two key legitimate interests underlying multi-employer bargaining: the voluntary nature of the association and the need for stability of the multi-employer unit").  Indeed, in *Bonanno*, the ultimate balance tipped in favor of the stability interest, with the Court upholding an unfair labor practice charge

Justice Scalia observed in a concurring opinion, however, that "[t]here is not a single decision, since this Court washed its hands of general common-lawmaking authority, in which we have refused to enforce on 'public policy' grounds an agreement that did not violate, or provide for the violation of, some positive law."  *Id.* at 68 (Scalia, J., concurring in the judgment) (citation omitted).  "Positive law typically consists of enacted law — the codes, statutes, and regulations that are applied and enforced in the courts."  Black's Law Dictionary (10th ed. 2014).

against an employer who withdrew from a multiemployer association during a bargaining impasse.

Where, as here, there are two competing policies applicable with regard to a single matter, neither can be a "dominant" policy, and therefore neither can drive a public policy refusal to enforce an arbitration award. This conclusion reflects the Supreme Court's approach in *Eastern Associated Coal*, which indicated that it is improper to vacate an arbitrator's decision on public policy grounds where there are countervailing policy considerations. *See* 531 U.S. at 65–66. In *Eastern Associated Coal*, an arbitrator ordered reinstatement of a worker who had been discharged after testing positive for marijuana. *Id.* at 59. The employer sued, seeking to have the award vacated on the ground that it "contravened a public policy against the operation of dangerous machinery by workers who test positive for drugs." *Id.* at 61. The employer argued that this policy could be discerned in a number of statutory provisions requiring suspension of workers who have operated commercial vehicles while under the influence of drugs. *Id.* at 63–64. The Court concluded, however, that when read in context, "these expressions of positive law embody *several* relevant policies." *Id.* (emphasis added). In addition to safety concerns, the statutes included a "policy favoring rehabilitation of employees who use drugs." *Id.* Moreover, "the relevant statutory and regulatory provisions must be read in light of background labor law policy that favors determination of disciplinary questions through arbitration when chosen as a result of labor-management negotiation." *Id.* As a result, the arbitrator's award was "not contrary to these several policies, *taken together*." *Id.* (emphasis added).

Similarly, even if, in this case, the arbitrator's decision disserved a policy favoring voluntary relationships between employers and multi-employer bargaining units, the decision *promoted* the policy favoring stability of the multi-employer unit.  And in any case, as in *Eastern Associated Coal*, these policies must be read in light of the background labor law policy, which "reflect[s] a decided preference for private settlement of labor disputes without the intervention of government."  *Misco*, 484 U.S. at 37; *see also* 29 U.S.C. § 173(d) ("Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.").  We therefore conclude that the district court erred in vacating the panel's award on this basis.

Drywall urges us alternatively to affirm the district court's decision on the basis of a separate public policy in favor of employee free choice in union representation. According to the company, the panel's award effectively locked Drywall's employees into ongoing union representation without the support of a majority of the bargaining unit.

Drywall's argument on this point hinges on its claim that its relationship with the Union is governed by § 8(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(f), rather than § 9(a), 29 U.S.C. § 159(a).  Normally, under § 9(a) of the NLRA, a union becomes the exclusive bargaining representative for a group of employees when it is "designated or selected" for that purpose "by the majority of the employees in a [bargaining unit]."  29 U.S.C. § 159(a). By contrast, § 8(f) "allows construction industry employers and unions to enter into agreements setting the terms and

conditions of employment for the workers hired by the signatory employer without the union's majority status first having been established in the manner provided for under § 9 of the Act." *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 266 (1983). A § 8(f) "prehire agreement" is "voidable and does not have the same stature as a collective-bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer." *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 341 (1978).[3]

The Memorandum Agreement between Drywall and the Union provides that Drywall has recognized the Union as the majority representative of its employees; "the Union has provided, or has offered to provide, evidence of its status as the majority representative" of Drywall's employees; and "the parties intend to and are establishing a collective bargaining relationship under Section 9" of the NLRA. Drywall, however, asserts that notwithstanding these provisions, the Union never made an affirmative showing of majority support. Given that "bargaining relationships in the construction industry are presumed to be covered by section 8(f)," *Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 766

---

[3] Following the National Labor Relations Board's decision in *John Deklewa & Sons*, 282 NLRB No. 184, 1385 (1987), *enforced sub nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988), however, a § 8(f) agreement cannot be unilaterally repudiated during the term of the agreement. "[U]pon the contract's expiration, the signatory union will enjoy no majority presumption and either party may repudiate the 8(f) relationship." *Id.* at 1386; *see also Mesa Verde Constr. Co. v. N. Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1125–26 (9th Cir. 1988) (en banc) (adopting the *Deklewa* rule).

(D.C. Cir. 2012), Drywall argues, absent a showing of majority support, contractual language alone is insufficient to establish a § 9(a) relationship. *Compare In re Staunton Fuel & Material, Inc.*, 335 NLRB No. 59 (2001) (holding that a written agreement alone can establish a § 9(a) relationship if certain conditions are met), *with Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 536–37 (D.C. Cir. 2003) (holding that contractual language alone cannot establish a § 9(a) relationship where the union actually lacks majority support), *and Madison Indus., Inc. & Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 349 NLRB No. 114, 1308 n.9 (2007) (noting that *Nova Plumbing* had "called the viability of *Staunton Fuel* into question").

We need not resolve whether the agreement between Drywall and the Union was a § 9(a) or a § 8(f) agreement. For present purposes, it is sufficient that there is nothing in the record to indicate one way or another whether the employees did or did not want union representation. Drywall submitted no evidence to the arbitration panel to substantiate its claim that the Union lacked majority status, nor did it introduce any evidence pertaining to whether its relationship with the Union was governed by § 9(a) or § 8(f). As explained above, neither we nor the district court may engage in independent factfinding on these issues.

Moreover, Drywall fails to recognize that, if its relationship with the Union *were* governed by § 8(f), the employees, if dissatisfied with their union representation, could call for an election at any time, *see Deklewa*, 282 NLRB at 1377, belying Drywall's contention that the extension of the agreement locked unwilling employees into union representation. Even if Drywall's factual claims were established, therefore, they would not indicate a violation of

a public policy in favor of employee free choice as to union representation. The district court correctly rejected this argument.

## CONCLUSION

Over 25 years ago, an en banc panel of this court recognized that when courts review the decisions of arbitrators in the context of collective bargaining agreements, "there may be a tendency for judges, often with the most unobjectionable intentions, to exceed the permissible scope of review and to reform awards in our own image of the equities or the law." *Stead Motors*, 886 F.2d at 1204. The persistence of the "plausibility" language in this area of our circuit's law has unwittingly exacerbated this tendency, as the present case demonstrates. As in *Stead Motors*, therefore, we once again "reemphasize the unique character of an arbitrator's function and the nearly unparalleled degree of deference we afford his decisions," *id.* at 1205, and reverse the decision of the district court.

**REVERSED.**